[CONSTITUTIONAL AND LOCAL LAW.]

## MATTHEWS v. ZANE and Others.

Where a party claiming title to lands under an act of Congress, brought
   a bill for a conveyance, and stated several equitable circumstances
   in aid of his title, and the State Court where the suit was brought
   having dismissed the bill, and the cause being brought to this Court
   by appeal, under the 25th sec. of the judiciary act of 1789, c. 20., upon
   the ground of an alledged misconstruction of the act of Congress by
   the State Court : *Held*, that this Cour: could not take into considera-
   tion any distinct equity arising out of the contracts or transactions of
   the parties, and creating a new and independent title, but was con-
   fined to an examination of the plaintiff's title as depending u; on the
   construction of the act of Congress.
The lands included within the Zanesville District, by the act of Con-
   gress of the 3d of March, 1803, c. 343. s. 6., could not, after that
   date, be sold at the Marietta land office.
A statute, for the commencement of which no time is fixed, commen-
   ces from its date.
The decision of this Court in *Matthews* v. *Zane*, 5 *Cranch*, 92, revised
   and confirmed.

APPEAL from the Supreme Court of the State of
Ohio, being the highest Court of equity of that State,
under the 25th sec. of the judiciary act of 1789,
c. 20.

The bill filed by the plaintiff, Matthews, in the
State Court, was brought for the purpose of obtain-
ing from the defendants, Zane and others, a convey-
ance of a tract of land to which the plaintiff alleged
that he had the equitable title, under an entry, prior
to that on which a grant had been issued to the de-

fendants. The validity of his entry descended on the construction of the act of Congress of May 19th, 1800, c. 209., the 6th section of the act of March 3d, 1803, c. 343., and the act of the 26th of March, 1804, c. 388., all relating to the sale of the public lands in the territory northwest of the river Ohio. The case stated, that on the 7th of February, 1814, the plaintiff applied to the Register of the Marietta District, and communicated to him his desire to purchase the land in controversy. The office of Receiver being then vacant, no money was paid, and no entry was made ; but the Register took a note or memorandum of the application. On the 12th of May, 1804, soon after the Receiver had entered on the duties of his office, the plaintiff paid tne sum of money required by law, and made an entry for the land in controversy, with the Register of the Marietta District. In pursuance of the 12th section of the act of the 26th of March, 1804, c. 388., and of instructions from the secretary of the treasury, the sale of the lands in the District of Zanesville, (which had been formed out of the Marietta District, and included the land in controversy,) commenced on the 3d Monday fo May, 1804, and on the 26th of that month the defendants became the purchasers of the same land. There were several charges of fraud in the bill, and a contract between the parties was alleged ; but as the opinion of this Court turned exclusively on the title of the parties under the act of Congress, it is deemed unnecessary to state these circumstances. The State Court having determined against the validity of the plaintiff's title under the act of

1822.

Matthews
v.
Zane.

Feb. 20th.

Congress, and dismissed his bill, the cause was brought by appeal to this Court.

Mr. *Doddridge*, for the appellant, stated, that the cause depended upon the construction of three acts of Congress, which he insisted had been misconstrued by the State Court. The first of these acts, that of May 10th, 1800, c. 209., established the present system of selling the public lands in Districts, and by that statute the land in controversy was within the Marietta District. The 6th section of the act of the 3d of March, 1803, c. 343., created an additional District, and provided that the lands within it should be offered for sale, at Zanesville, under the direction of a register and receiver, to be appointed for that purpose, who should reside at that place. The 12th section of the act of the 26th of March, 1804, c. 388. directs the lands in the District of Zanesville to be offered for public sale on the third Monday of May in that year.

On the first view of the case, difficulties present themselves, on the side of the appellant, in the authority of previous decisions, and especially a decision of this Court, between the same parties.[a] But that decision resulted from an incorrect and imperfect statement of facts in the former case. Circumstances which are now disclosed did not appear in that case. Upon the present record the following points will be insisted on :

1. That even by a strict technical construction of

a Matthews v. Zane, 5 *Cranch*, 92.

the statutes in question, the power of sale did not cease at Marietta, until after the 12th of May, 804, the date of the plaintiffs' purchase. (2.) That such was the practical construction given to those laws by executive officers, which ought in the present case to be conclusive, because it fulfils every object of the law, preserves the private rights of individuals, and if set aside by a mere technical objection, would open a door for the most extensive litigation and disturbance of titles acquired under the land laws of the United States. (3.) That supposing the act of March 30, 1803, had in express terms, or by necessary and inevitable implication, taken away the power of sale at Marietta, yet it could not begin to have that effect, until duly promulgated at that place, it not having in fact been transmitted to the officers at Marietta, until after the plaintiff's entry.

The land laws must certainly be considered as forming a part of the contract between the Government, and each individual who wishes to become a purchaser of the public domain. If contracts between the public and individuals are to be considered in the same light as contracts between individuals, then the principle applies that a *bona fide* and innocent purchaser, from an agent who has not received due notice that his authority is superceded, shall not be injured by the negligence of the principal, in not giving notice.[a] The rules of interpretation applicable to the present case, are laid down by the ele-

a 4 *Hall's Law Journal*, 16.. 2 *Dall.* 320

1822.

Matthews
v.
Zane.

menfary writers on the construction of statutes, and will be found in the common abridgments of the law.[a]  All these rules necessarily resolve themselves into the intention of the law maker, which is some-times to be collected from the cause or necessity of making the statute, and at other times from other circumstances of equal weight.[b]  Sir William Jones has asserted the true principles on this subject.[c]  " Such is the imperfection of human language," says he, " that few written laws are free from ambi-guity ; and it rarely happens that many minds are united in the same interpretation of them."  And then, after relating an anecdote of Lord Coke, adds : " I will here only set down a few rules of interpreta-tion, which the wisdom of ages has established, when the sense of the words is at all ambiguous— 1st.  The intention of the writer must be sought, and prevail over the literal sense of terms ; but penal laws must be strictly expounded against offenders, and liberally against the offence.

" 2. All clauses, preceding or subsequent, must be taken together to explain any one doubtful clause.

" 3. When a case is expressed to remove any doubt whether it was included or not, the extent of the clause, with regard to cases not so expressed, is by no means restrained.

" 4. The conclusion of a phrase is not confined to

a 6 Bac. Abr. tit. Statute. (I.) (C.)
b Vere v. Thompson, Hardr. 208.
c Ld. Teignmouth's Life of Sir W. Jones, 267.

the words immediately preceding, but usually extended to the whole antecedent phrase.

"These are copious maxims, and, with half a dozen more, are the stars by which we steer, in the construction of all public and private writings."[a]

So, also, this Court has laid it down as "a well established principle in the exposition of statutes, that every part is to be considered, and the intention of the legislature to be extracted from the whole. It is also true, that when great inconvenience will result from a particular construction, that construction is to be avoided, unless the meaning of the legislature be plain, in which case it must be obeyed."[b]

1. In enforcing the construction we contend for, the further considerations which present themselves under the first point are—That all the land laws passed previous to the act of May 10th, 1800, merged in that act; and by it, the system of selling the public lands in districts, through agents called registers and receivers, was settled: so that at the passage of the act of March 3, 1803, that system, in all its relations, was *the law*; and to all the provisions of the act of May 10th, 1800, and the rights established thereby, that of March 3, 1803, expressly refers, and for its operative capacity necessarily depends.

The whole system is laid in two important objects —public policy, and the rights of the community generally and individually; both terminating in

a Letter to J. Macpherson, Esq. Governor-General of Bengal, *Sir W. Jones' Life*, 267.

b U. S. v. Fisher, 2 *Cranch*, 286.

the sale of the public lands. The public policy is two-fold—first, *revenue* ; second, *national growth* and *prosperity*, by the extension of population and improvement. The right of every individual is, to appropriate to himself any tract of land within the provisions of the system. Words are not necessary to show the importance of the public policy in both its branches ; and the interest felt by the community, in the *right to appropriate*, is of equal extent, and as strong—as distinctly marked, too, as the policy itself ; and, though a right peculiar to the American people, is, nevertheless, a general right ; requiring, indeed, to be regulated by law ; but none will say that the government might, or could wholly repress its exercise, any more than wholly to repress the exercise of the general right to carry on trade and commerce.

The second branch of the public policy—also the right to acquire and improve new lands—did not commence with the land laws of the United States; both existed under, and the latter was exercised through, the regulations of colonial and State government, are coeval with the settlement of America ; and when the same policy and right fell within the jurisdiction of the national government, laws were immediately passed to regulate them, and have been continued from time to time, until they all merged in the act of May 10th, 1800 ; so that the right of every individual in the community to purchase and settle any part of the lands within the provisions of that act, may emphatically be called an *existing right*.

The first branch of the public policy, *revenue*, en-

gaged the attention of the national government immediately after the termination of the revolutionary war, and has been pursued by it ever since, with an undeviating aim ; and it may be here observed. that one condition in the cession from Virginia is, that the lands ceded *shall be sold*, and the proceeds go in discharge of the public debt. It is not denied that Congress may suspend the sale of the whole or any part of the public lands ; but doubtless, in such case, there would appear some distinct and good reason for doing it, as in the act of May 10, 1800, in order to attain, more effectually, the objects of the whole system ; and then the intention was expressed with irresistible clearness in the repealing clause. But where nothing of this kind is pretended, where no object or motive can be perceived leading to suspension, the *implication* must be strong indeed. to induce a court of justice to suppose a design to depart from every principle of the law in the case.

The constitution and the law show, that the President had no power to establish the Zanesville offices until after the next meeting of Congress ; for those offices were not vacancies to be filled during the recess ; and it will not be contended, that he was bound to summon a special meeting of the Senate for that purpose. Furthermore, the President had no power to cause sales to commence at Zanesville, until, in some act subsequent to that of March 3, 1803, the time for opening sales should be appointed ; and we shall now endeavour to show the correctness of that position. The words of the act of March 3, 1803, (sections 5. and 6.) refer, generally, to the act

1822.

Matthews·
v.
Zane.

of May 10th, 1800, and embrace all the regulations prescribed, among which a prominent one is, that all the land must be offered at public sale before being offered at private sale, and that a day should be appointed by law when sales are to commence at each office. The object of public sale, when any tract of country is brought into market for the first time, is, principally, the enhancement of price above the legal limitation, by means of competition for the most valuable tracts ; but it has another of some importance, that is, settling in this way the preference between competitors.

The fair inference from these considerations is, that no sale of any part of the unappropriated lands in the military tract could legally take place, either at Zanesville or Chillicothe, under the bare provisions of the act of March 3, 1803 ; that some farther legislative provision was necessary, appointing the time *when* sales should commence. This provision is found in the act of March 26th, 1804. It it true, that in another act passed, also, the 3d March, 1803, " regulating the grants of land, and providing for the sale of the public lands south of Tennessee," the time when sales are to commence is left with the President ; but it is to be by proclamation, giving due notice. This is a modification only of the practice under the same principle and policy.

But it may be said, the act of May 10, 1800, excepts from public sale a part of the Marietta District, and all the Steubenville District. This is true ; and the reason for this exception is not readily perceived. The only probable one is, that all the part excepted in the Marietta District was known to be a

rough, hilly country, therefore no prospect of sales being immediately effected in it. The distinction, on any other account, between the west of the Muskingum, including the township intersected by it, and the lands lying east of those townshi s seems to be idle. With respect to the Steubenville District, all the most valuable lands in it had been sold in New-York, in 1787, and at Pittsburgh, in 1796; therefore, the competition to be expected at public sale was not thought of sufficient importance to be secured by statutory provision. But whatever may have been the reason for excepting these lands from public sale, the principle of *fixing by law* the time when the *private sale* of them shall commence is still preserved.; thus securing the *equitable mode of settling by lot* the preference between applicants for the same tract, provided for in the act of May 10th. In fine, the reference of the act of March 3, 1803, to that of May 10, 1800, is general, therefore embraces the general provisions only ; and the correct conclusion from a whole view of this matter is, that the act of March 3, 1803, was *inchoate,* inoperative of itself, in respect to sales at Zanesville, and, therefore, it would be absurd to give to it a constructive repeal of the preceding statute.

All that has been urged against suspending sales at Marietta until the operative organization of the Zanesville District took place, applies with equal force to the act of March 26, 1804, as to that of March 3, 1803. The absurdity is just as great in principle; the only difference is, its effects are not of so long continuance. Besides, the act of March 26,

1804, *appoints the time when* sales shall commence at Zanesville, and thus removes the only objection of the Register of the Zanesville District to the construction for which we contend.

There is no difference, in regard to construction, between a law which *definitively appoints the time when a certain thing is to be done in future,* and a law which leaves *indefinite the future time when that certain thing* is to be done; and practically, there is less reason to give the subsequent statute a repealing operation from the day of its passage, in the latter, than in the former case, because, there is less inconsistency in suspending the existing rights of individuals, and the public interest and policy for a certain, than for an uncertain time. Resting with some confidence in this position, we shall here introduce a case precisely in point, to show, that the *repugnant words* are not *alone and abstractedly* to be considered.[a]

" By a statute passed on the 9th of July, the jurisdiction of a Court of Requests is enlarged after the 30th of September following, from debts of 40s. to 5l.— and it is also enacted, that *if any action shall be commenced* in any other court for a debt not exceeding 5l. the plaintiff shall not recover costs : yet from *a necessary construction of the whole act,* a plaintiff shall recover costs in an action commenced in another court, for a debt between 40s. and 5l. after the passage of the act, and before the 30th of September. Till then he could not sue in the Court of Requests, and therefore had no other remedy but to sue in another court."

a Whitham v. Evans, 2 *East. Rep.* 135.

Here was an attempt made to give to the words "if any suit shall be commenced," &c. an abstract meaning and repealing force, from the day of passing the act; but they were not allowed to suspend the *existing right to sue somewhere.*

The admissions heretofore made, that is, that had the day been appointed when sales were to commence at Zanesville, they might have been continued at Marietta up to such day, seems to render a reference to the above case unnecessary, in respect to former arguments on the other side; but those admissions may not be extended to the present hearing: and, besides, the cited case shows that the same kind of reasoning has been resorted to on other occasions, that it has been put down by the court, and that the *whole law* and practical reason are the only sure guides to sound construction. In every proposition importing that the lands taken from the Marietta District "shall be sold at Zanesville," these repugnant words must be used; and when the object is to give them an abstract repealing effect from the moment they are used by the legislature, it matters not *when* "sold at Zanesville."

2. The second point in our argument is, that the complainant's purchase was made conformably to the practical construction given to the laws in question by the proper executive officers. This relates, principally, to the Secretary of the Treasury, the superintendant of the whole; but extends also to the Register of the Marietta District, who, being without instructions, had to act upon his own discretion.

The facts in the bill show, that laws affecting the land offices are received, by the respective officers, through the Treasury Department, with instructions; it therefore follows, that had the Secretary of the Treasury construed the act of March 3, 1803, as suspending sales at Marietta, he would have given instructions to that effect. This deduction flows by such strong implication from the facts and the nature of the case, that direct proof, if susceptible of being had, would be unnecessary: it is, in fact, involved in the acknowledgment of the Secretary of the Treasury, that his first impressions, (that is, that all sales made at Marietta, after the passing of the act of March 3, 1803, were void, as suggested by the private opinion of the Register of the Zanesville District,) were erroneous; and without saying any thing more than has been said, in relation to the act of March 26th, 1804, we may confidently assume the fact stated as the foundation of this point; and shall now endeavour to show that the conclusion drawn from it is correct.

The true doctrine of executive construction is, that, generally, it is to be considered and respected: for executive officers are officers of the constitution and laws, as well as the judges; and in the performance of their proper functions, the former are under the necessity of putting a construction on the acts of the legislature, as well as the latter: and it may be added, that they are always supposed to act under the advice of a high law officer, appointed for that purpose. When, in this necessary exercise of their judgment, they put such a construction on a

statute as promotes its evident object, preserves all the rights of individuals, and which at the same time becomes a rule by which title to things real or personal is acquired, such construction ought not to be set aside by a rigid criticism of any kind ; but where it injures the public interest, or abridges and restrains the rights of individuals, it should be strictly examined and corrected.

When executive constructions and regulations form the rule by which the most interesting of all titles, the title to land, is acquired, all must see and admit the reasonableness of preserving rights growing out of them. Executive construction, in such cases, acquires all the importance, and involves all the consequences, of judicial decisions. Could it be established, that the Secretary of the Treasury had misconstrued the act of March 3, 1803, in permitting sales to be made at Marietta, after its passing ; and that this was so erroneous as to make void those sales ; such a decision would reach, as has before been observed, two valuable interests, *bona fide* acquired as ours was, and long possessed as ours ought to have been : for their titles cannot, and ought not, to be preserved by the mere refusal of executive officers to act ; neither, it is conceived, because the land cannot now be entered in tracts of the same size in which they were offered at public sale, by reason, that the law is modified in this respect ; for, should this be admitted, the land officers might, through ignorance, or fraud, entangle titles to any extent. *All lands,* in fact, unsold at public sale are liable to be entered at private sale ; and all tracts

not legally sold are still public lands and liable to be entered.

The observations of Sir William Jones, before quoted, go to illustrate and support our reasoning on this point. It may readily be supposed, that a difference might take place in construing the minor provisions of a statute, though all should agree in its main object and intent: when this is attained, the minor provisions are of little moment.—Suppose the act of March 3, 1803, was actually couched in such ambiguous terms as, taken in their literal and grammatical sense, would raise a doubt whether sales were to continue at Marietta after its passage; but that the Secretary of the Treasury, in consequence of a construction formed from the exercise of his judgment, on a view of the whole law, had given actual instructions to continue them there. Would a sale made under such circumstances be declared void? —We think not; and certainly not in the present case, which stands clear of every literal and grammatical ambiguity—where the necessarily implied construction of the secretary of the treasury runs with the obvious intendment of the whole law.

In closing our argument on this point, we beg leave to press this view of the subject with some earnestness on the consideration of the Court; and confidently taking it for granted, *that the not instructing the Marietta officers at all was equivalent to instructions to continue sales there,* we again ask, that if *actual instructions had been given, to continue sales at Marietta,* until a few days before they commenced at Zanesville, giving sufficient time only,

for the proper notice to the Zanesville officers; and the Register of the Zanesville district had thought proper to disregard these regulations, and sell the land over again, would the Court sanction his sales? or, in other words, would it now sanction a sale of the two tracts entered at Marietta, in July, 1803?

3. Our third point is, that supposing the act of March 3, 1803, had, in express words, or by necessary implication, taken away the power of the Marietta office to sell; yet, that it did not begin to have that effect, until duly promulgated at Marietta, conformably to the usual manner of promulgating such acts, &c., and the same of the act of the 26th of March, 1804.

The reason of the rule, that, where no day is appointed, statutes begin to have effect from the day of their passage, seems to be this: that it being practically impossible actually to notify every person in the community of the passage of a law, whatever day might be appointed for its taking effect, no general rule could be adopted less exceptionable. The general rule may, in some instances, produce injustice; but if ignorance of the law was admitted as an excuse, too wide a door would be left open for the breach of it. Where statutes are liable to produce injustice by taking immediate effect, the legislature will, except through inadvertence, appoint a future day from whence they are to be in force. Mr. Justice Blackstone,[a] after treating of the promulgation of laws, and the duty of legislatures to make

a 1 Bl. Com. 45.

1822.

Matthews
v.
Zane.

them public, says, " all laws should, therefore, be made to commence *in future*, and be notified before their commencement, which is implied in the term prescribed." The fair inference from this, and, indeed, from all that he and other writers have said, in treating on the elementary principles of law, is, that where unjust consequences result from the application of a general rule to a particular case, courts have the power to except such case and bring it under the control of equitable construction ; and to ask, " did the law-maker, supposing him to be an upright man, intend to include or except this case ?"[a]

One feature in the reason of the general rule is, that it would be practically impossible to fix on any time for laws to take effect so as that each person affected by them, or liable to be affected, could, with certainty, have notice ; had such notice been practicable, doubtless the rule would have been different ; and where this part of the reason ceases, according to a maxim of law and reason, so much of the rule ceases also. Now, when a law, under the supposed form of that of March 3d, 180 , should be promulgated at a land office, every person who could in any way be affected by it, would have actual notice; the applicant would know that he could not purchase, and he could not complain of injury. Lord Kaimes' reasoning[b] goes to show, that where the claims of equity can be brought under a general rule, " a Court of

a  6 *Bac. Abr. tit. stat.* (I.) 386.
b  *Kaimes' Eq. Introduct.* XI.

equity declines not to interfere."[a] Promulgation of the law at each land office is an easy rule, liable to no uncertainty or difficulty, and, besides, had been the usual practice ; therefore, no general promulgation can be a substitute for it. The necessity for the usage is manifest ; for, if the numerous dependents of the Treasury Department were permitted to construe the law for themselves, endless contradiction and confusion must be the consequence. The settled course of decision, in relation to deeds which have not been put on record within the time prescribed by law, falls exactly into Lord Kaimes' reasoning. Where it can be proved that the party who holds the second deed, though first on record, had notice of the previous deed, he shall not be permitted to take advantage of the omission to record in the holder of the first deed.

There is a case in *Dallas*[b] precisely in point, to support the restriction we contend for on the abstract taking effect of statutes, when the nature of the case affords reason for such restriction. The laws of the Colonial Legislature of Pennsylvania were in force until revoked by the King and Council, and the question was, whether a revocation took effect at its date in London, or when notified in Philadelphia ; and it was held by the Court, not until notified to the Governor and Council in Philadelphia.

The decision and opinion of this Court in the case of *Arnold v. The United States*,[c] will not, it is

a *Kaimes' Eq. Introduct.* XI.

b Albertson v. Robinson, 1 *Dall.* 9.

c 9 *Cranch*, 104.

presumed, be found, on due examination, to impinge the foregoing reasoning on this point. The question was, so far as that case is analogous, whether double duties should commence throughout the whole country from the passage of the act, or from its notification at the proper office in each collection district. The double duties were a burden which the whole community ought, in justice, to bear equally; and without making the act take a proper and absolute effect from the day of its passage, this equality of imposition would not be produced; an importation at Washington would have been charged with an impost from which one at a more distant port would have been exempt. Had the act been for *reducing* the import duty, no doubt but the money received at a distance, after the passing of the act, would have been refunded; this, it is believed, was done on the repeal of the internal taxes; and thus a general reciprocity is produced in the operation of laws of this nature. In this case there was no particular injury set up, but the hypothetical possibility only of injury, and that, not such as would, necessarily, follow the act of importation, but growing out of contracts involved in, and properly referrible to, the general risk of trade. Had the question been, an entire suspension of the *existing right* to import, without the usual equitable provisions on like occasions, allowing all vessels which had departed without knowledge of such suspension, to complete their voyages, or with penalties for importation, we may well suppose the taking effect of the law would have been restrained to its due notification at the proper office:

or, to show the same principle in another point of view, it may be asked whether the penalties of the embargo laws attach before notice of their passage at the naval offices in the respective districts?

The constitution of the United States has not, in express words, prohibited *Congress* from passing laws impairing the obligation of contracts; but the prohibition is so strongly implied, and such laws, as well as *ex post facto* laws, are so contrary to justice, that it is presumed an act to that effect would be declared void : such a law, for instance, as should go to re-sell any tract of land which had been legally sold. That the entry of a tract of public lands forms a perfect contract will not be denied ; neither, that under the supposed form of the act of March 3, 1803, an entry at Marietta, before it was possible that notice could reach there, would come fully withing the spirit and meaning of an equitable contract. Now, the established course in the administration of justice, protects equitable contracts equally with those which are strictly legal. The operation of a criminal or penal law, under the construction contended for on the other side, would render it, in its practical effects, as perfectly *ex post facto*, as one made to take effect before its passage ; and by parity of reasoning, that construction virtually implies a breach of contract, and so is contrary to the constitution of the United States, as well as contrary to reason and justice. The pardoning power of the executive in a criminal case, might afford a remedy for the injustice which would follow; but in a civil one, the only remedy must be found in the reasonable and equitable con-

struction of the judiciary, " who have authority over all laws, and more especially over statutes, to mould them according to reason and convenience to the best and truest uses."[a]

But it may be said that the general promulgation of all laws, in this country, is sufficient notice ; and that from the passage of the act of March 3d, until the plaintiff's entry, or even application in February, there was ample room for notice. It is true, that in this country all laws have a general promulgation ; but it is equally true, that many laws are, notwithstanding, strictly local : such is the act in question, and considering the *established usage*, and the reason for that usage, the Register of the Marietta District cannot be supposed to be bound to have acquired a knowledge of the act in the general way.

A striking analogy exists between the land laws and those for the collection of duties on importations. The two leading points in the public policy are the same in both, that is, national strength and prosperity, and revenue ; and however deeply laid in the nature of political society the right to carry on trade and commerce may be, we have, it is conceived, sufficiently shown that the right to settle and improve new land enters as deeply into the nature of political society in this country ; and has, too, all the force of prescription of which the right is susceptible. The government, acting for the people, have no more claim to the price of the public lands, than to a part of the price of merchandize imported, and therefore have no more exclusive and arbitrary control over

*a Bac. Abr. tit. Statute*, (H.) 378.

the former than the latter; and, repeating what has been before mentioned, an attempt to suppress the settlement of new lands would be as sensibly felt by the community at large, as an attempt to suppress trade and commerce: at the same time, both require to be regulated by law. Now, suppose some newly acquired territory were to be brought within the operation of the revenue laws, and, for this purpose, it should be found expedient to annex it to a part of a former district, making a new district, and that preparatory measures were necessary before the new district could be organized, and that acts should be passed with analogous provisions to those found in the laws in question; would they be construed to suspend the collection of duties in, and the right to import into, the old district?

We have before mentioned, that the case of Wilson v. Mason,[a] was cited at the first trial in the Supreme Court of Ohio, to show that notice of an illegal act was void; a position which, we also mentioned, was not disputed : but that case, and the opinion of the Court in it suggests some considerations for direct and hypothetical illustration, which we beg leave to introduce. In the opinion it is said, "But if this opinion should be too strict, if an act entirely equivalent to an entry could be received as a substitute for one, a survey does not appear to be such an act," &c.—and then the opinion goes on to show the reason why; hat is, that the entry is the necessary notice of the appropriation of any part of the waste lands, and the only way to prevent others, with equal

1822.

Matthews
v.
Zane.

a 1 *Cranch,* 95.

rights, from being misled and injured ; that the entry was, in fact, the very remedy the law had provided against a previously existing evil.    Now, in the present case, supposing suspension of sales at Marietta some how entered into the general provisions of the law—an entry at Marietta would be an " entire equivalent" to an entry at Zanesville ; for it is clear, that before sales could begin at Zanesville, notice must be given what tracts had been sold at Marietta.    This too, would have been a general notice ; general, at any rate, to the extent of the object; not an individual notice merely, which the Court would not, in the case of Wilson v. Mason, suffer to take place of the general rule.

A case may readily be supposed, under the land laws of the United States, offering arguments and objections parallel to those in the case of Wilson v. Mason.    Suppose A. purchases in one district land lying in another ; discovering his mistake, and that B. is about to enter the same land in its proper district, he gives notice of his previous entry : here A. might say, that as between him and the public, a purchase in one district was the same as in another, and that B. had notice.    In such case a court would doubtless say, that to permit entries in one district, of land lying in another, would create confusion ; that a person with equal rights would never know when he made a safe entry, and that a particular exception, notwithstanding personal notice, was inadmissible ; but, as just shown, the objection would not lie in the present case ; so that whatever the " *if*," in the opinion of the Court amounts to, may fairly be placed to our side of the question.

But the point we propose to illustrate principally, by the case of Wilson v. Mason, is the *right to purchase*, by considering that case hypothetically. The right of every individual holding a warrant to appropriate to himself waste lands, was not more substantially, or forcibly given, by the laws of Virginia, than the right to purchase any vacant tract of the United States land is given, by the act of May 10, 1800. It is true, that in Virginia, money was advanced on obtaining the warrant, but no priority of claim grew out of the prior date of the warrant, except, in the instance of an accidental competition; and having money to pay, and applying to enter, puts the applicant under the laws of the United States on as good ground in law and equity as he stood on who came forward to enter under the laws of Virginia. Besides, by a provision in the act of May 10th, before noticed, money may be paid to the Treasurer of the United States : this corroborates and strengthens our reasons for this equality of right. The right to appropriate extended also over the whole of the waste lands in the state, though the act of appropriation must be performed in some one county. Now, let it be supposed that the question had been between Wilson and Mason, *whether Mason's right to enter, in such county as he thought proper*, was to be suspended for fifteen months, in consequence of similar legislative provisions to those found in the acts of March 3, 1803, and March 26, 1804, and with constructions and doings of the proper executive officers, parallel to those in the present case; can it for a moment be imagined, that the better right would have been decreed to Wilson ?

The phraseology of the laws for the collection of duties on imports is, that the bays, ports, harbours, &c. within certain limits, *shall be districts*, with some appropriate denomination; and when any now district is made, that from and after a certain day the harbors, &c. within certain limits, *shall be a district* by the name of the district of———. Here the language precludes all sophistry in relation to the time when the new district is to go into operation; and its effect on the old district; but suppose the language was—there shall be a district to be called the district of A. and from and after a certain day the duties shall, &c. be paid at B. This, one very principle of sound construction, would amount to precisely the same thing; and certainly the words, *shall be a district*, would not, under this supposition, be construed to stop the power of collection in the old district, until the time they were to be collected in the new one at B.; yet, according to their reasoning, this would take place, for if the *verbal* repugnance only is to be considered, as before observed, it matters not when the *practical* repugnance commences.

Mr. *Hammond*, for the respondents. The first point made for the respondents, is, that this Court has no jurisdiction.

The alleged contract and fraud of Zane constitute the sole ground for the interference of a Court of Equity. They are the gist of the plaintiff's case, and in respect to these, this Court has no supervising control over the State Court. Whether the contract alleged was one, the obligation of which

a Court of Chancery should recognize; whether it created a trust in Zane, which a Court of Equity would compel him to execute; whether the fraud was such, that a Court of Equity would relieve against it; and whether making general propositions of compromise, and delaying more than ten years before a tender of money was made, and a performance specifically required was such diligence, on the part of the plaintiff, as to entitle him to the aid of a Court of Equity, are all questions over which the State Court has complete control. In a Court of Equity the right of the plaintiff to the relief sought depends upon the decision of the questions here enumerated, and not upon the correct construction of the acts of Congress.

Let it be conceded, that the plaintiff's construction of the acts of Congress is correct, and the consequence is, that at the time of the sale at Zanesville, he held a legal right, imperfect to be sure, but purely legal in its character. The allegations in the bill show that the plaintiff lost this right by the misconception, or misconduct of the Secretary of the Treasury, and the officers of the land office at Marietta, and not in consequence of the alleged agreement with Zane. If the plaintiff had a right, and that right had been duly regarded by the public officers, neither the alleged contract with Zane, nor Zane's subsequent purchase could have impaired it. Upon what principle, then, does he come in equity to set up that right against Zane and M'Intire? Is it under colour of an agreement with Zane to impeach the conduct of the Secretary or Register, and

Receiver? Can it be said that a decision against the relief sought, in such a case, is a decision against a right or title claimed under an act of Congress? Is it not a more rational inference that the decision was against the party upon the ground that the contract did not entitle him; or upon the ground that he could not have relief in equity? or that if entitled to redress, it must be against the officer, for damages, upon the principle suggested by this Court?[a]

Suppose that this Court, upon an examination of the case, shall adopt the plaintiff's construction of the different acts of Congress, does it follow that they must, or can reverse this decree? Can they do it, without examining the obligation and extent of the alleged agreement with Zane? Can they do it without inquiring into the subsequent conduct of Matthews, and determining how far the whole case entitles the party to the aid of a Court of Equity? It seems to us that they cannot. And we insist that in this Court these inquiries cannot be made: the 25th section of the judiciary act expressly forbids it.

Again; upon the construction of the acts of Congress insisted on by the plaintiff, the certificate of purchase granted to him by the Register of the land office at Marietta, on the 16th of May, 1804, vested in him a legal right to the possession of the lands in dispute. Such certificates have always been received in Ohio as evidence of title in ejectment.— The bill shows no reason why this legal remedy was not pursued. If the party by his own laches

a M'Clung v. Silliman, 6 *Wheat. Rep.* 598.

has lost his remedy at law; can he come into a Court of Equity for relief? Does the bill show any circumstance that prevented him from diligently pursuing his legal remedy, or does it allege that it was lost by the contrivance of the defendants? Can this Court examine these allegations, or determine whether upon this ground the bill was, or was not, properly dismissed?

But last of all, the case made in the bill shows, that this is the same case, and between the same parties, decided by this Court, in 1809.[b] That was an ejectment; the facts were agreed ; the point submitted for decision was, the true construction of the acts of Congress referred to, and the decision was against the plaintiff's purchase. If the true construction of the acts of Congress constitutes the essential point to be decided in this bill, then it must be considered as a Bill in Chancery brought in the State Courts, to review the decision of this Court in ejectment. Can it be maintained that to dismiss such a bill is to decide against a right or title set up under an act of Congress?—We conceive that upon an examination of this record, it will be found immaterial whether the acts of Congress separately, or the alleged agreement and conduct of Zane separately, or whether these conjointly, combined with the other circumstances of the case, constitute its material points ; the general dismissal of the bill makes no case upon which the jurisdiction of this Court can be made to operate.

The merits are supposed to involve the just con-

a Matthews v. Zane. 5 Cranch, 92.

struction of the acts of 1803 and 1804, referred to in the bill; and what right, if any, the plaintiff can derive from the alleged agreement and conduct of Zane.

The act of May, 1800, which originated and settled the present plan of selling the public lands, directed that lands, within certain specific boundaries, should be sold at land offices established at certain places. The uniform understanding and construction of this law has been, that the power to sell at each of the Land Offices was confined to the lands directed by law to be sold there. The officers at Chillicothe could not sell lands below the Little Miami, nor lands in the seven ranges. They had no power to effect such sale, and no right could be acquired by a purchase so made.

A new, and fifth land office was established at Zanesville, by the 6th section of the act of March, 1803; and it was directed that the lands within the 11th range, and east of it within the military tract, and all the lands north of the Ohio Company's purchase, west of the seven first ranges and east of the district of Chillicothe, should be sold at Zanesville. The act containing this provision consists of eight sections. The first three are intended finally to make provision for settling claims for military bounties.— The fourth authorizes warrants to be issued to General La Fayette. The fifth provides for surveying the unappropriated lands within the military tract, and directs that so much of these lands as lie west of the 11th range shall be made part of the district of Chillicothe, and shall be sold there, " *under the same*

*regulations that other lands are within the said district.*" The sixth section creates the new district at Zanesville, including a large body of lands within the military tract, and a large body, also, of the lands before that time directed to be sold at Marietta.— The seventh section gives longer time to the purchasers of lands within J. C. Symmes' purchase to complete their payments: and the eighth section relates to warrants, and platts and certificates of survey, within the Virginia military tract. This act was approved the 3d of March, 1803. No time is fixed for it to take effect; and hence a question is mooted, as to the time when the sixth section commenced its effective operation, so as to put an end to the power of making sales, at Marietta, of the lands formerly within the Marietta District, but directed by the 6th section to be sold at Zanesville.

It is not pretended but that the act in question, for all its general objects, took effect from its passage. There is nothing in its terms to except the 6th section from the general operation. The other seven sections speak from their passage, from the general taking effect of the act. The 6th section says the lands "shall be offered for sale at Zanesville." When? From this time; for no other time is designated. And it is a settled maxim, that where no time is appointed, by the act itself, for it to take effect, its operation commences from its passage. We have nothing to do with cases that may be supposed, of acts committed or rights commenced before the passage of a law that affects them was, or could be known. All such cases stand upon their own circum-

stances, and are exceptions to the general rule.    The 6th section directs that the lands shall be sold at Zanesville, and as no time is appointed for commencing the sales there, the act, in the natural import of its terms, according to settled rules of construction, must be understood to direct the sales to commence immediately, and by necessary consequence, annuls the power to sell the same lands at Marietta, that existed before the act was passed, from the same period of time.    Such being the plain import of the words used, when interpreted by a standard maxim of interpretation, those who undertake to render the 6th section inoperative for an indefinite time, by connecting it with the preceding laws, and with other circumstances, take upon themselves the burthen of proof, and are bound to make out their case.   It is not maintained by any one, that lands within the Zanesville District could be sold at Marietta, after the taking effect of a legal provision, directing them to be sold at Zanesville.    The true point in dispute then, is this : When did this 6th section take effect ?

The proposition of the plaintiff, if I have been able to comprehend it, seems to be something like this : The 6th section of the act of March 3d, 1803, ought not to be construed as containing any determinate, positive operative provision ; but should be regarded as merely provisional, or inchoative, dependent upon some future act of legislation to give it force and effect.   To sustain this position, various arguments are urged, all of which appear to be predicated upon three principles :

First.  A construction which would withdraw any

part of the public lands from market is against the public policy.

1822.

Matthews.
v.
Zane.

Second. It is against the right of every individual to purchase.

Third. It is inconsistent with the practical construction given by the Secretary of the Treasury.

If the truth of every one of these dogmas were admitted, it would seem a sufficient reply, that the positive provisions of positive law never can be made to yield to any such considerations. When determining upon the construction to be given to an ambiguous provision, they ought to have their influence. But they cannot be legitimately used, first to render a plain provision ambiguous, and then to determine its meaning.

The sixth section, as I have already insisted, stands clear of any ambiguity, and to decide that it takes effect from its passage, does not necessarily determine that its operation must be to withdraw any part of the public lands from market.

So far from being merely inchoative, the sixth section was capable of being carried into immediate practical effect, according to its terms. The officers might have been immediately appointed and furnished with platts and surveys of the unsold lands within the lands taken from the Marietta District; sales might have commenced immediately, and so soon as the military lands were surveyed, they, too, might have been brought into market. Certainly it cannot be contended, but that the lands within the military tract, attached to the Chillicothe District, by the fifth section, might have been brought into market as soon

as surveyed, without any additional legislative provision. The plaintiff is, therefore, totally mistaken, as to the legitimate consequence of giving to the 6th section an immediate operative effect. Such construction tends to bring the public lands into market, not to shut them out. That the officers were not, in fact, appointed, and that the sales did not commence, are matters that have no bearing upon the argument. The true meaning of a statute must be determined by an examination of its provisions ; not by the conduct of those appointed to carry it into execution. This view of the subject is also a satisfactory answer to the allegation respecting the rights of individuals to purchase. If that right exists, in the extent contended for, it could not be impaired by giving the 6th section immediate effect. So far as it was affected, it was by circumstances of a character very different from giving to the law a correct construction.

But the principles assumed, both with respect to the public policy, and the individual right to purchase, are not admitted to be correct. Of the public policy the legislature are exclusively the judges, and the individual right to purchase is also, before its actual application to any particular tract, entirely subject to legislative regulation. Now, I can well conceive, that it might be deemed good policy to withdraw, for a time, a portion of the public lands from the market. And if the legislature should do so, it is conceived that their act would be, at once, decisive of the public policy of the measure, and, so far, must absolutely control the individual right to purchase.

If, then, the just construction of the 6th section should have the effect alleged, of withdrawing from the market a portion of the public lands, that circumstance would furnish no ground whatever upon which a court of justice should, or could, properly interpolate a fanciful construction of their own. They could not rightfully assume a course of policy different from that prescribed in the law, and make their own imaginations a standard of construction.

In fact, it was a part of the public policy, until long after 1803, to withhold a portion of the public lands from market. The three sections in each Township reserved for future disposition, was kept back by this policy, and sold at a much higher price in consequence of it, when actually offered for sale. Can it be pretended, that any citizen had a right to purchase these reserves, until their sale was authorized by law, and the terms of the purchase defined ? We are required to examine whether the Zanesville District is erected, established, or settled by that section. We maintain that the Zanesville District was fully and completely established by the 6th section. If it was not, it is not yet established. It is recognized as an existing district by subsequent acts : but is, in no other way, authorized or established. It could not be essential to the existence of the district, that a time for commencing sales should be fixed, or that the Register and Receiver should be appointed. Indeed, until the district was established, no such appointment could be made. The perplexity in which the plaintiff involves his own propositions : at one time considering the section as designating the

limits of a new district; at another, regarding it as only providing that a new district should be erected, at some time indefinitely future; and again declaring it *inchoate* and inoperative; telling us, in one breath, that some subsequent legislative provision is required, fixing the time when it should be established, and in the next, fixing that time upon a speculation of his own, without any such legislative act, is, of itself, very strong evidence that he is in error. The terms of the statute are simple and unambiguous. All this glossing is not required to find out their obvious import. It is not an effort to elucidate, but to establish an hypothesis.

For the defendants, it is contended, that from the passage of the ac of March 3d, 1803, the Zanesville District was estɔlished, and the power to sell at Marietta determined. We have shown that this construction involves none of the inconveniences suggested by the plaintiff; but that if they actually existed, it resulted not from the provisions of the law; but from other causes. Our interpretation is founded upon a plain, palpable, and consistent doctrine, in every respect definite and certain. Its only possible evil, a suspension, for a short period, of the sales of a small portion of the public land. The construction insisted upon by the complainant is destitute of all certainty, and calculated to involve the whole subject in perplexity and doubt. There is a district, the lands within which must be sold at Zanesville. Was it established by the 6th section of the act of 3d March, 1803? No, says the opposite argument, that section only defined the limits to enable the Sur-

veyor General to prepare the platts and surveys. No, says the opposite argument again, that act was only *inchoative* and *inoperative*, it provided that the Zanesville District should be erected at some time indefinitely future. Was it established by the act of the 26th of March, 1804, appointing the time of the commencement of the public sales? No, again, says the opposite argument, that act " in relation to the present question, only fixes the future time when it shall be established." Was it established by the appointment of the officers? No, says the complainant, the new district was not established and settled by appointing the officers. And this negative involves the very singular circumstance, that officers should be appointed for a district not established and settled. By the strict terms of the law, the complainant insists that the Zanesville District was not erected, legally established, and settled until the 19th of May, the Saturday before the sales commenced on the Monday, 21st, following. But by a reasonable construction, he concedes that the Zanesville District might be considered as established and settled after the 12th of May. At *what time after*, and before the 19th, he has not informed us, and, no doubt, for this very good reason, that after he made his entry, on the 12th of May, he had *no interest in the question.* We have the voluminous bill and the elaborate argument of the complainant before us, do they show how the Zanesville District was established, and when it was established? There are, undoubtedly, a multiplicity of allegations, to show that it was not established until after the 12th of May, but all the

1822.

Matthews
v.
Zane.

rest is left in obscurity.    We have not been able to perceive one single sound reason for considering the 12th of May an era of any importance, except that it was the day upon which the plaintiff made his entry. Ought a court of justice thus to depart from the direct and plain import of unequivocal terms.

Another point laboured in the bill, and strongly urged in argument, is, that the whole conduct of the Secretary of the Treasury, as superintendant of the sales of public lands, was in accordance with the hypothesis maintained by the complainant. The act in question, March 3d, 1803, was never specially promulgated at the Marietta offices. No instructions with respect to it were ever sent to the officers ; and sales made at Marietta within the tract directed to be sold at Zanesville, after the passage of the act were confirmed by the Secretary.

One general observation must be made with respect to all these allegations. The Secretary was the agent of the law, and was subject to its provisions, which he could neither restrain nor extend.—If he fell into error, that error can avail nothing in a court of justice, bound to declare their own interpretation, not to adopt that of others.

We think we have shown that the three *principal* propositions upon which the plaintiff rests his construction of the act of 3d March, 1803, are equally unfounded in fact, and untenable in argument; our interpretation of that act is not shaken by them : and it is moreover sustained by the unequivocal decision of the Court, in this very case."

*a* 5 *Cranch,* 92.

It is alleged, that the act of the 3d of March, 1803, is a mere affirmative act, in no respect repugnant to the act of May, 1800, until, by an actual commencement of sales at Zanesville, it shall be rendered practically repugnant. Very little examination will show that this is the old question, in a new dress. The power to sell at Marietta was created by the act of May, 1800, and depended upon that act for its existence. The act of March 3d, 1803, creates a power to sell the same lands at Zanesville. These two powers are inconsistent with, and repugnant to, each other. Both cannot *subsist* at the same time. In deciding the question of *repugnancy*, we are not to inquire only, whether the two powers can be concurrently *executed* ; it is indispensable to determine whether they can *exist* together. Now, the power to sell at Zanesville, given by the act of March, 1803, is a complete, not an inchoative power. Although no time is fixed at which that power shall be executed, yet the power itself is created, and if it exist, then it is repugnant to the previous power, given to sell at Marietta, and repeals that power. It is impossible that the Court cannot at once perceive the distinction between creating the power to sell, and providing for the immediate execution of that power. It is because the complainant has not regarded the distinctive character of these two circumstances, that he has involved his argument in so much perplexity. And here, if it were essential to the argument, it might be shown, that should it be conceded that Congress did not intend to suspend the sales, and that such is the effect of our construction, yet it re-

1822.

Matthews
v.
Zane.

sults from the force of the terms used, contrary to the intention. They created a complete and perfect power to sell at Zanesville, and omitted to provide, that the legal effect of that power should be suspended, until measures were arranged for its immediate execution. So that the question still recurs, when was the power to sell at Zanesville, under the act of March, 1803, actually created? If, as we contend, that power existed the moment the act took effect, it was from that moment repugnant to the power of making sales of the same lands at Marietta. The two acts are, in no single view, affirmative of each other on this point, although they both relate to the sales of public lands. The legal power to sell at Zanesville must have existed, separately and substantively, before any measure could be taken to carry that power into effect. This consideration alone exposes the fallacy of connecting the power to sell, the appointment of the officers, and the commencement of the sales, as all essential to the *erection* of the district.

*March 1st.*

Mr. Chief Justice MARSHALL delivered the opinion of the Court.

This suit was brought in the State Court of Ohio for the purpose of obtaining a conveyance of a tract of land to which the complainant supposed himself to have the equitable title, founded on an entry prior to that on which a grant had been issued to the defendants. The State Court decreed that the bill should be dismissed, and that decree is now before

this Court, on the allegation that the Court of the State has misconstrued an act of Congress.

The plaintiff has stated several equitable circumstances in aid of the title given by his entry; but unless his entry be in itself valid, there can have been no misconstruction of an act of Congress in dismissing the bill, and this Court cannot take into consideration any distinct equity arising out of the contracts and transactions of the parties, and creating a new and independent title.

The validity of the plaintiff's entry depends on the land laws of the United States.

In May, 1800, Congress passed an act dividing an extensive territory northwest of the river Ohio, into four districts; and establishing a land office in each, for the sale of the public lands within that district. This act prescribes the time, place, and manner, in which the lands of each district shall be offered at public sale; and directs, also, the manner and terms in which those not sold at public sale may be disposed of at private sale. The lands of the district comprehending the tract in controversy were to be offered for public sale at Marietta, on the last Monday of May, 1801.

On the 3d of March, 1803, Congress passed an act, the 6th section of which creates a fifth district, and enacts that the lands contained within it " shall be offered for sale at Zanesville under the direction of a Register of the land office and Receiver of public moneys, to be appointed for that purpose, who shall reside at that place."

This district includes the land in controversy.

On the 26th of March, 1804, Congress passed an act entitled, " an act making provision for the disposal of the public lands in the Indiana territory, and for other purposes."

This act comprehends the lands directed to be sold under the act of 1800, and 1803, as well as the lands in Indiana.

The 5th section enacts, that " all the lands aforesaid," (except certain enumerated tracts, of which the land in controversy forms no part,) " be offered for sale to the highest bidder, under the direction of the Surveyor General, or Governor of the Indiana Territory, of the Register of the land office, and of the Receiver of public moneys at the places respectively where the land offices are kept, and on such day or days as shall, by a public proclamation of the President of the United States, be designated for that purpose."

On the 7th of February, 1804, Matthews applied to the Register of the Marietta District, and communicated to him his desire to purchase the land in controversy. The office of Receiver being then vacant, no money was paid, and no entry was made ; but the Register took a note or memorandum of the application.

The counsel for the plaintiff insists, that the title of his client commences with this application.

The law authorizes the respective Registers to sell at private sale all the lands which may remain unsold at the public sales, and says the sales " shall be made in the following manner, and under the following conditions, to wit :

1. " At the time of purchase, every purchaser shall, exclusively of the fees hereafter mentioned, pay six dollars for every section, and three dollars for every half section he may have purchased, for surveying expenses; and deposit one-twentieth part of the amount of purchase money, to be forfeited if within forty days one fourth part of the purchase money, including the said twentieth part, is not paid."

The payment of the money required by the act is obviously indispensable to the purchase. Without such payment, the sale prescribed by law could not be made ; and certainly no sale, had the Register attempted to make one, could be valid if made in opposition to the law. But the Register has not attempted to sell, nor could Mr. Matthews have so understood the transaction. He took a note of the land the plaintiff intended to purchase ; and, had the receipt of the Receiver been produced, might, perhaps, have made the entry. In so doing he would have acted in the double character of Register, and agent of the purchaser.

That there was no Receiver was undoubtedly not the fault of Mr. Matthews; but this circumstance as completely suspended the power of selling land in the Marietta District as if there had been neither Register nor Receiver ; as if there had been no land office.

The transactions then between Mr. Matthews and the Register on the 9th of February, 1804, may be put entirely out of the case.

On the 12th day of May, 1804, soon after the Re-

ceiver had entered on the duties of his office, Matthews paid the sum of money required by law, and made an entry for the land in controversy with the Register of the Marietta District.

The 12th section of the act of the 26th of March, 1804. directed that " the lands in the District of Zanesville should be offered for public sale on the third Monday of May."

In pursuance of this act, and of instructions from the Secretary of the Treasury, the sale of the lands in the District did commence on that day ; and, on the 26th day of that month, the defendants became the purchasers of the land in controversy.

*This Court confined to the consideration of the title set up under the act of Congress.*

There are many charges of fraud in the bill. and a contract between the parties is alleged. But this Court cannot look into those circumstances, unless they had induced the Court of Ohio to determine against the person having the title under the laws of the United States. As this case stands, the opinion of the State Court on the fraud and the contract, is conclusive ; and the only question to be discussed here is, the title of the plaintiff under the acts of Congress.[a] This depends entirely on the validity of his entry made on the 12th of May, 1804.

a The constitution of the United States declares, (art. 3. s. 2.) that " the judicial power shall extend to all cases, in law and equity, arising under this constitution, the Laws of the United States, and treaties made, on which shall be made, under their authority; to all cases affecting ambassadors, other public ministers and consuls ;" &c. And that, " In all cases affecting ambassadors, other public ministers, and consuls, and those in which a State shall be a party, the Supreme Court shall have

This question has already been decided in this Court.

original jurisdiction. *In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as the Congress shall make.*"

The judiciary act of 1789, c. 20. s. 25. provides, "that a final judgment, or decree, in any suit, in the highest Court of Law or Equity of a State, in which a decision of the suit could be had, where is drawn in question *the validity of a treaty or statute of,* or an authority exercised under, *the United States, and the decision is against their validity,*" &c.; "or where is drawn in question the construction of any clause of the constitution, *or of a treaty, or statute of,* or commission held under, *the United States, and the decision is against the title, right, privilege, or exception, specially set up by either party, under such clause of the said constitution, treaty, statute,* or commission, may be re-examined and reversed or affirmed in the Supreme Court of the United States, upon a writ of error," &c. "*But no other error shall be assigned or regarded as a ground of reversal,* in any such case as aforesaid, *than such as appears on the face of the record, and immediately respects the beforementioned questions of validity or construction of the said constitution, treaties, statutes,* commissions, or authorities, in dispute."

Under these provisions, with a view to the questions of jurisdiction in the above case, (Matthews v. Zane and others,) the following points have been determined by this Court. In an action of ejectment between two citizens of the same State, in the State Court, for lands within the State, if the defendant sets up an outstanding title in a British subject, which he contends is protected by the 9th art. of the treaty of 1794, between the United States and Great Britain, and that therefore, the title is out of the plaintiff; and the highest Court of Law or Equity of the State decides against the title thus set up, it is not a case in which a writ of error lies to this Court. The words of the judiciary act must be restrained by the constitu-

The plaintiff brought an ejectment against the defendants for the lands in controversy ; and, the judgment of the State Court being against him, the cause was brought by writ of error into this Court.

tion, which extends the judicial power to all cases *arising under treaties* made by authority of the United States. This is not a case *arising under the British treaty;* and whether an outstanding title be an obstacle to the plaintiff's recovery is a question exclusively for the decision of the State tribunal. But it must be understood that this Court has appellate jurisdiction where the treaty is drawn in question, whether *incidentally* or *directly.* Whenever a right grows out of, or is protected by a treaty made under the authority of the United States, it is sanctioned against all the laws and judicial decisions of the respective States ; and whoever may have this right under such treaty, is to be protected. Thus, if the British subject, in whom was supposed to have been vested the outstanding title protected by the treaty, or his heirs, had claimed in the cause, it would have been a case arising under the treaty. But as neither his title, nor that of any person claiming under him, could be affected by the decision, it was held not to be a case arising under a treaty. *Owings* v. *Norwood*, 5 *Cranch,* 344. But where the decision is against the validity of the treaty, or against the title, specially set up by either party to the cause, under the treaty, this Court has jurisdiction to ascertain that title, and determine its legal validity, and is not confined to the mere abstract construction of the treaty itself. *Smith* v. *The State of Maryland,* 6 *Cranch,* 286. *Martin* v. *Hunter, ante, vol. I. p.* 304. 357. The last clause in the 25th section of the judiciary act, which restricts the grounds of reversal to such *as appear on the face of the record,* and *immediately* respect the construction of the treaty or statute in dispute, applies only to cases where the parties claim under various titles, and assert various defences, some of which may and others may not regard the construction of a treaty or

In February, 1809, the judgment of the State Court was affirmed, this Court being of opinion that the erection of the Zanesville District suspended the power of selling the lands lying within that district, at Marietta.

The counsel for the plaintiff contends, that several material circumstances which are now disclosed, did not appear in that case. But the Court is of opinion, that the additional circumstances relied on in argument can, in no degree, affect the point decided in that case, which was, that the power of selling at Marietta ceased when the new district was established, so far as respected the land in that district.

This point has been re-argued with great labour and talent, and has been re-considered by the Court. The result of that re-consideration is, that the original opinion is correct. We still think, that on the passage of the act by which the District of Zanesville was created, and the land within it directed to be sold at that place, the power of selling the same land at Marietta necessarily ceased.

It is, we think, impossible to look at these acts without perceiving that the lands lying in one district could not be sold in any other. Their words and their policy equally forbid it. The land in controversy might have been sold at Marietta by the Register and Receiver of that place, previous to the

statute, and was intended to limit what would otherwise unquestionably have attached to this Court, the right of revising all the points in dispute, and to confine it to such errors as respect the questions specified in the section. *Martin* v. *Hunter*, *ante. vol.* I. 357.

3d of March, 1803, because it lay in the district, the lands of which were directed by law to be sold at that place by those officers. Had the land been out of that District, it could never have been sold at that place, or by those officers. When, by law, a new district was formed, comprehending this land, and its sale was directed at a different place, and by different persons, the land is placed as entirely without the District of Marietta, as if it had never been within it. The power of the officers of the land office at Marietta to sell, is expressly limited to the lands within the district; and land which ceases to be within the district, is instantly withdrawn from that power.

That the effect of this construction is to suspend the sales of land in the new district until the proper officers should be appointed, does not, we think, operate against it. An immense quantity of land was in the market; and the laws furnish no evidence in support of the opinion, that the eagerness to keep the whole continually within the reach of every purchaser, was so great as to hazard the confusion which might arise from any uncertainty respecting the office at which any portion of it might be acquired. If this intention had been so predominant, the legislature would certainly have provided that the lands in the Zanesville District might still be sold at Marietta until some day to be fixed in the law by which it might be supposed that the office at Zanesville would come into operation. The omission to make such a provision forbids the opinion that Congress considered the necessity of keeping all their lands in

a state to be instantly acquired, as being so urgent that a Court would be justified in construing one of their statutes contrary to its words. The known rule being, that a statute for the commencement of which no time is fixed, commences from its date, the act of the 3d of March, 1803, separated this land from the Marietta District on that day, and withdrew it from the direction and power of the officers of that district. It was legally competent to those who possess the power of appointment immediately to appoint necessary officers to carry on the sales at Zanesville, and Congress did not think proper to provide for continuing the sales at Marietta until such officers should be appointed.

This Court, then, retains its opinion, that, independently of the act of the 26th of March, 1804, the entry made by Matthews on the 12th of May, 1804, would be invalid. That opinion is still further strengthed by the act last mentioned. That act, considering its 5th and 12th sections together, directs all the lands in the Zanesville District to be sold under the authority of the proper officers on the third Monday of the ensuing May. Consequently there could be no power to sell any of the land within that district at Marietta.

The case of the plaintiff may be, and probably is, a hard one. But to relieve him is not within the power of this Court. We think the plaintiff is not entitled under the laws of the United States to the land he claims; and that the decree ought to be