Points decided.

# CHARLES W. MARTIN *v.* J. M. BERRY.

POWER TO ENACT BANKRUPT LAWS NOT EXCLUSIVE IN CONGRESS.—The power conferred upon Congress by the eighth section of the first Article of the Constitution of the United States, "to establish uniform laws upon the subject of bankruptcies throughout the United States," is not exclusive, and therefore, except when Congress has actually exercised its power upon the same subject, the several States may pass insolvent or bankrupt laws.

IDEM—EFFECT OF PASSAGE BY CONGRESS OF BANKRUPT LAW UPON STATE INSOLVENT OR BANKRUPT LAWS.—When Congress enacts a Bankrupt Law it is supreme; and from the time it takes effect until it ceases to be in force all State laws on the same subject and in conflict therewith are suspended, and the States placed under 'a disability to exercise power of the like nature.

IDEM—CONFLICT OF STATUTES.—The statute of this State for the relief of insolvent debtors and protection of creditors, (Stats. 1852, p. 69,) is in conflict with the Federal Bankrupt Law, passed March 2d, 1867, and has been suspended in its operations from the time said Bankrupt Law went into effect.

IDEM—WHEN FEDERAL BANKRUPT LAW WENT INTO EFFECT.—The Federal Bankrupt Law passed March 2d, 1867, did not go into effect, so as to suspend the operations of the Insolvent Law of this State, until June 1st, 1867.

IDEM—EFFECT OF PASSAGE BY CONGRESS OF BANKRUPT LAW ON INSOLVENT PROCEEDINGS PENDING IN A STATE COURT.—Where a State Court has acquired jurisdiction under a State law of a case of insolvency, and is engaged in settling the debts and distributing the assets of the insolvent before or at the date at which an Act of Congress upon the same subject takes effect, the State Court may nevertheless proceed with the case to its final conclusion, and its action in the matter will be as valid as if no law upon the subject had been passed by Congress.

IDEM—WHEN STATE COURT ACQUIRES SUCH JURISDICTION.—Under the Insolvent Law of this State, the Court in which a proceeding under it is commenced acquires the legal custody of the estate of the insolvent petitioner from the time of making an order staying the creditors from all further judicial proceedings against the petitioner or his estate, as provided in the ninth section of said statute; at which time the Court acquires jurisdiction to conduct said proceedings to a conclusion, without being affected therein by a Federal Bankrupt Law which goes into effect at any time after the acquisition of said jurisdiction.

APPEAL from the District Court, Fifth Judicial District, San Joaquin County.

The facts are stated in the opinion of the Court.

*J. H. Budd,* and *Schell & Hewell.* for Appellant.

*W. S. Montgomery,* and *H. B. Underhill,* for Respondent.

By the Court, SANDERSON, J. :

This was a motion to quash an execution upon the ground that the defendant had been discharged from all liability upon the judgment upon which it had been issued by a final decree in certain proceedings taken by him under the statute of this State for the relief of insolvents and the protection of creditors.    The motion was denied in the Court below, and the defendant has appealed.

The affidavit and exhibits upon which the motion was made show that the judgment upon which the execution had been issued was rendered on the 17th of January, 1866, and that the proceedings under which the defendant claims to have been discharged from its payment were commenced on the 1st of May, 1867, and that the final decree therein was rendered on the 1st of July, 1867.

The only question presented for our consideration is as to the effect of the Act of Congress entitled " An Act to establish a uniform system of bankruptcy throughout the United States," of the 2d of March, 1867, upon the statute of this State, under which the defendant obtained his discharge.

By the eighth section of the first Article of the Federal Constitution power is granted to Congress "to establish uniform laws upon the subject of bankruptcies throughout the United States."    In respect to this and cognate provisions there was at first some conflict of opinion upon the question whether the power thereby granted was exclusive, but it was finally settled that it was not, upon the ground that there was nothing in the language itself or in the nature of the power which required that it should be exercised exclusively by Congress.    The question arose in the case of *Sturges* v. *Crowninshield*, 4 Wheaton, 122.    The case was an action of assumpsit, brought in the Circuit Court of Massachusetts, upon two promissory notes.    The defendant pleaded a discharge under "An Act for the benefit of insolvent debtors and their creditors," passed by the Legislature of New York

CAL. REPS. XXXVII—27

at a time when there was no Act of Congress upon the subject of bankruptcies, and it was held that the statute of New York was not repugnant to the Constitution of the United States, or, in other words, that the power over that subject was concurrent, and the several States might exercise the power so long as there was no conflicting legislation by Congress.

. The question arose again in the case of *Ogden* v. *Saunders*, 12 Wheaton, 213. That, also, was an action of assumpsit brought by a citizen of Kentucky against a citizen of Louisiana. Among the defenses pleaded was a certificate of discharge under an Act of the Legislature of the State of New York, of which State the defendant was a resident at the date of his acceptance of the bills of exchange in suit. One of the questions was, whether the law of New York was invalid as being repugnant to the Constitution of the United States. It was elaborately argued by very able counsel upon both sides, and it was again declared that the States were not prohibited from passing insolvent or bankrupt laws except when Congress has actually exercised its power upon the same subject, and the State laws conflict with those of Congress. (See, also, *Blanchard* v. *Russell*, 13 Mass. 12; *Adams* v. *Story*, 1 Paine's C. C. 79.) This corollary follows: That all the State laws upon the subject become inoperative or suspended the moment the law of Congress takes effect, so far as all persons and cases which are within the purview of the latter are concerned. While there was some difference of opinion between the members of the Court in the case of *Sturges* v. *Crowninshield* upon other points, they were all agreed, as stated by Mr. Justice Story in *Ex parte* Eames, 2 Story, 326, " That, when Congress did pass a Bankrupt Act, it was supreme, and that the State laws must yield to it, and could no longer operate upon persons or cases within the purview of such Act. The enactment of such an Act suspended the State laws on the same subject, and created a disability in the States to exercise powers of the like nature."

It is claimed, however, on the part of the defendant, that

his proceedings under the State law were commenced prior to the date at which the Act of Congress took effect, and are, therefore, unaffected by the latter Act, although the assignment was not made and his discharge was not decreed until after it had taken effect.

If a State Court has acquired jurisdiction under a State law of a case in insolvency, and is engaged in settling the debts and distributing the assets of the insolvent before or at the date at which the Act of Congress upon the same subject takes effect, the State Court may, nevertheless, proceed with the case to its final conclusion, and its action in the matter will be as valid as if no law upon the subject had been passed by Congress. This question arose in the case of *Judd* v. *Ives*, 4 Metcalf, 401, and was determined as just stated. In that connection, however, a further question arises as to when or at what stage in the proceedings the jurisdiction of the State Court attaches so as to exclude the case from the operation of the Act of Congress. Does it attach upon the filing of the petition, or at some subsequent stage of the proceedings—at the completion of the publication of notice to creditors, or the appointment of the assignee, or the actual assignment and delivery of his property by the insolvent to the assignee? This must, necessarily, depend upon the terms of the State law. In the case cited from Massachusetts, it was held that a case was not within the operation of the Act of Congress if it had been commenced before the Act of Congress took effect. But it must be observed that, under the Insolvent Law of Massachusetts, which was before the Court in that case (Supplement to the R. S. Mass., p. 84,) the Judge to whom the petition was presented was required to forthwith appoint, by warrant under his hand and seal, some suitable person as messenger to take possession of the estate of the insolvent, and the messenger was required to publish a notice to the effect that a warrant had issued against the estate of the insolvent, and that the payment of any debts and the delivery of any property belonging to such debtor, to him or for his use, and the

transfer of any property by him, were forbidden by law. Thus, at the very commencement, the debtor became divested of his property, and a qualified right thereto vested in the messenger, and it was for that reason that the Court fixed upon the commencement of the proceedings as the point of time at which the jurisdiction of the State Court attached, so as to exclude the case from the operation of a Federal law going into effect thereafter. The Court said: "But we are nevertheless of opinion that this consequence of the Act is limited to cases instituted under the Insolvent Law subsequent to the period when the Bankrupt Law went into operation, and that it cannot supersede or suspend proceedings rightfully commenced under the Insolvent Act prior to the time of its going into operation. The counsel for the petitioner admits that it could not, if the property of the insolvent had been actually assigned prior to the first of February, when the Bankrupt Law went into operation; but he contends that, as the assignment in this case was not actually made until the seventh of February, the whole proceedings were suspended or superseded. Upon consideration, we are of opinion that the proceedings under the commission are not to be thus separated, but that they are to be treated as the parts of one whole; that the assignment not only relates back to the first publication of the notice and vests all the property of the debtor, both real and personal, in the assignee, but that the debtor is divested of his property before such assignment, by virtue of the warrant to the messenger and the taking of the property of the debtor into custody, by force of which a qualified property in the estate vests in the messenger, insomuch that no act of the debtor, after the due service and publication of the warrant, can be lawfully done to make any transfer of his property, or to affect the rights of any of his creditors; that the property is, by the act of publication, placed in the custody of the law in the person of the messenger, and that the Judge or Master alone can dispose of the same by the appointment of an assignee to receive it, or by dissolving the process. The process, then,

in the present case, having been legally commenced, and the debtor being dispossessed of his property, and the same being in the custody of the law, the rights of creditors also who have proved their debts, and others who may prove them, being fixed, the taking effect of a law of the United States at a subsequent period cannot, in our judgment, disturb these proceedings, nor take away the jurisdiction of the State tribunals."

The Insolvent Law of this State, however, in this respect is somewhat different from that of Massachusetts. Under it, the Insolvent Court is not authorized to seize the property of the insolvent upon the filing of the petition. It can only make an order requiring his creditors to show cause against his discharge at a time and place, of which they are to be notified by the Clerk, and a further order staying all proceedings against the insolvent, unless it afterward appears by the oath of a creditor that there is reason to apprehend that the insolvent will take advantage of the stay to make some disposition of his property to the prejudice of his creditors, in which case the Court may appoint a receiver to take possession of the insolvent's property and hold it for the benefit of the creditors. If this is not done, the debtor may remain in the undisturbed possession of all of his property until the meeting of his creditors, at or before which time he is required to deposit with the Clerk of the Court his books, notes, securities, and the like. He may also transfer property and collect debts due him in the meantime, without prejudice to his application, provided he accounts therefor to his assignee within ten days after his appointment.

Thus the Court does not take the actual possession of the insolvent's property at the commencement of the proceeding, as in Massachusetts, but may not do so until some time thereafter, the length of time being contingent, and so far as the reasoning of the Court in *Judd's Case* turns upon that circumstance alone, it fails here. But while the Court does not take the actual possession, we think it, nevertheless, has the legal custody and control of the property from the

moment it makes the order staying the creditors from all interference with it. By that order the Court places the property of the insolvent into the custody and under the protection of the law, and the insolvent himself is converted, in effect, into an officer of the Court, charged with its actual custody, subject to the orders of the Court. The date of that order must, we think, be taken as the point of time at which the jurisdiction attaches under the law of this State. Otherwise, no uniform rule can be adopted upon this subject, and each case must be left to stand or fall according to its own conditions.

This order of the Court, in the proceedings in question, was made on the 1st of May, 1867. If the Act of Congress did not take effect until after that day, it follows, from what has been said, that those proceedings were unaffected by it, and are as valid as if the Act of Congress had never been passed.

The Act of Congress was passed on the 2d of March, 1867, but it is claimed by the defendant that it did not take effect so as to supersede State laws until the 1st of June, 1867. This point turns upon the construction of the last section of the Act, which reads as follows:

"*And be it further enacted*, that this Act shall commence and take effect, as to the appointment of the officers created hereby, and the promulgation of rules and general orders, from and after the date of its approval; *provided*, that no petition or other proceeding under this Act shall be filed, received, or commenced before the first day of June, *Anno Domini* eighteen hundred and sixty-seven."

On the part of the plaintiff, it is claimed that it took effect, in all respects, from the date of its approval, except as to the institution or commencement of proceedings under it. In support of this view, a decision by Judge Leavitt of the District Court of the United States for the Southern District of Ohio, is cited. (7 American Law Register, N. S, 435.)

The reasoning of Judge Leavitt in support of the construction contended for by the plaintiff, doubtless contains the pith of all that can be said on that side. Speaking of the section above quoted, he says: "The phraseology of this proviso is somewhat peculiar and significant. It does not declare that the statute, as to all matter not included in the preceding part of the section, shall not take effect until the first of June, but merely that no proceedings shall be instituted under the Act before that date. Its effect, therefore, is, by a fair construction, that while it suspends the right to proceed until the day named, it was the intention of the lawmakers that, as to the body of its provisions, it should take effect upon its passage. If this were not the intention, why provide specially that no petition should be filed or other proceeding had before the first of June? If it had been intended to postpone the operation of the entire Act except for the specific purpose mentioned in the beginning of the section until the day named, it may be pertinently asked why it was not so expressed in clear terms? Not being so expressed, and the words used not admitting of such a construction, the conclusion is irresistible that it was not intended —that the main provisions of the Act should be a dead letter until the first of June." The Judge thereafter refers to the language of the thirty-fifth and thirty-ninth sections of the Act as sustaining his construction. The language of the thirty-fifth section, upon which reliance is placed, relates to preferences and fraudulent conveyances made by the bankrupt, and provides that they shall be void if made within *four months* before the filing of the petition against him, thus showing that the Courts, in bankruptcy, are authorized to adjudicate upon transactions which may have occurred before the first of June, from which it is argued that the Act must have taken effect as to such transactions before that date. The thirty-ninth section declares what shall be deemed acts of bankruptcy, and characterizes them as acts transpiring "after the passage of this Act," from which it is argued that the Courts, in bankruptcy, may investigate those acts after

the filing of the petition, and therefore the Act must have taken effect from its passage.

In our judgment, the construction adopted by Judge Leavitt gains no support from the language of the thirty-fifth section, to which he refers. He argues that because the thirty-fifth section declares certain acts, *if committed within four months* before the filing of a petition, and in fraud of the provisions of the Act, shall be void as against the assignee in bankruptcy of the person by whom they were committed; and as petitions may be filed as early as the first of June, therefore the Act, so far as it authorizes an inquiry into the transactions of the alleged bankrupt previous to the filing of the petition, must have taken effect from its passage. If the argument proves anything as to the date at which the Act was intended to take effect, so far as it relates to such transactions, it proves too much. If the Act, in the respect supposed, must have been intended to take effect from its passage, because the transactions of the alleged bankrupt may be looked after for four months prior to the first of June, it must, according to the argument, have been intended to take effect on the first of February, more than a month prior to its passage. Still worse. Further on in the same section it is provided that certain acts committed within *six months* prior to the filing of the petition shall be void. Then, according to the argument of Judge Leavitt, the Act, so far as it relates to such transactions, must have taken effect *six months* prior to the first of June, or more than *three months* prior to its passage.

The argument, so far as it is deduced from the language of the thirty-ninth section, is more plausible upon first impression. The section deals with the subject of *involuntary bankruptcy*, and declares that any person who shall do any of the several acts therein specified "*after the passage of this Act*," shall be deemed to have committed an act of bankruptcy, and may be adjudged a bankrupt upon petition brought within six months after the act was committed. If we confine our attention to the language of this section, it

would seem that Congress intended that the Act, so far as it relates to the matters therein dealt with, should take effect immediately; but when we look to the language of the thirty-fifth section, which deals with cognate matters, transpiring even previous to the passage of the Act, in connection with it, it loses all significance upon the question as to when any part of the Act was intended to take effect, and throws no light upon the meaning of the fiftieth and last section, which deals exclusively with that question. If the cognate matters of the thirty-fifth section prove—if they prove anything in that direction—that Congress intended that the Act should so far take effect *prior* to its passage, and therefore, for that reason, cannot be accepted as testimony upon the question of Congressional intent as to when the Act should take effect, the language of the thirty-ninth section certainly cannot be rationally considered as throwing any light upon that question, merely because it adopts a different limit as to the retrospect of the Courts in bankruptcy, which chances to be the same as the date of the passage of the Act. As we consider, the language of these sections throws no light whatever upon the question when Congress intended the Act should go into operation. It undoubtedly manifests an intent on the part of Congress to empower the Courts, in bankruptcy, to look into the past transactions of the alleged bankrupt, extending back, in certain cases, to the passage of the Act, and in other cases still further back; but has, in our judgment, no other or further significance. In that view, the only questions which could arise in connection therewith would be such as attend upon all statutes of a retrospective character, with which we are not at present concerned. A statute containing retrospective provisions may be made to take effect at a future time as well as one of which the provisions are entirely prospective.

The rule by which the time at which an Act is intended to take effect is to be ascertained, is plain and simple. If the Act itself is silent, and there is no general law upon the

subject, it takes effect from its passage. (*Mathews* v. *Zane*, 7 Wheaton, 164.) If the Act itself fixes the date, or attempts to do it, the date is to be determined by a construction of the section or clause which deals with the question. We return, therefore, to the language of the fiftieth section, by which alone, in our judgment, the question is to be decided. To ascertain its meaning, if it be doubtful, we first bring ourselves, as near as possible, into the same relation to the subject which Congress itself occupied. Congress was at work upon "a uniform system of bankruptcy throughout the United States." The system proposed, from its nature, could not go into immediate operation. Many of the officers by whom it was to be administered were to be selected, and rules and regulations upon various subjects were to be devised and adopted—rules of practice and procedure in the District Courts; for regulating the duties of the various officers of those Courts; for regulating the practice and procedure upon appeals; for regulating the filing, custody, and inspection of records; and, generally, for carrying the various provisions of the Act into effect; all of which, when devised and adopted, were to become a part of the system. For the appointment of officers and the preparation and promulgation of these rules and regulations, time and the services of the Judicial Department of the Government were required. (Sec. 10.) Until all this should be done, the system would be incomplete, and, from the very nature of the case, could not be put in operation. To complete it in the manner proposed, however, the Act must be first passed, for otherwise the department selected to perfect the system would be without authority to do so. To pass the Act in silence as to the time at which it was to take effect, would be to commit the solecism of declaring that to be law, which, from necessity, must remain, for a time at least, a dead letter; and, in addition, leave the system to go into operation at an uncertain time, and at different times in different sections of the Union, for the appointment of officers, and the promulgation of rules and regulations throughout the various sections of the

country could not well be made upon the same day. Without the appointment of officers, and the adoption of rules and regulations, the law could never have any practical operation, but would remain a dead letter upon the statute book, or, in other words, no law at all. Under these circumstances it became at least advisable to make some express provision in relation to the taking effect of the Act, and the first idea which would naturally occur to a reasonable mind would be, that so far as the Act required further action to perfect the system, and prepare it for a practicable application to the objects contemplated by it, it should go into immediate effect, but should not take effect in other respects until the system should be complete, and, therefore, capable of being put to the use for which it was intended. And such we consider to have been the idea which occurred to Congress. Hence they provided: "This Act shall commence and take effect as to the appointment of the officers created hereby, and the promulgation of rules and general orders, from and after the date of its approval;" which implies that in other respects it should not then take effect, and, in keeping with that implication, they added: "*Provided*, that no petition or other proceeding *under this Act* shall be filed, received or commenced before the 1st day of June, *Anno Domini* 1867." It is true other language might have been employed which would have more clearly expressed the idea which we think was intended. Had they substituted the words, "in all other respects the Act shall take effect on the 1st day of June, 1867," there would have remained no obscurity, and the Courts would never have been called upon to remove it by construction. But the obscurity is more apparent than real. If we call to mind the general scope and object of the statute—if we remember that it is not so much a declaratory as a remedial statute, of which the benefits are to be obtained only through the agency of the Courts, and in accordance with certain rules and regulations which are yet to be provided, the language which was used becomes clearer to our comprehension, and we perceive that the

remedies which the statute provides, and therein the operation of the statute itself, are postponed until the first of June, with nearly, if not quite, the same certainty we should have experienced had Congress used the language suggested as a substitute.

As already suggested, the main end and object of the statute is remedial. In the nature of such statutes they can have no operation until the remedy becomes available. To say that a Court shall entertain no proceeding by which the remedy afforded by the statute can be made available until a certain time is equivalent to saying that until then there is no remedy, or, in other words, there is no law authorizing it. Suppose a Legislature should pass a law providing that in certain cases a creditor, upon filing a certain petition or affidavit and a bond, shall be entitled to a writ of attachment, and, at the close, should say: "*Provided*, that no affidavit or petition or bond under this Act shall be received or filed in any Court having jurisdiction over the subject matter of this Act until the first day of June next;" would not the operation of the Act be as effectually postponed until June next as if the language had been: "*Provided*, that this Act shall not take effect until the first of June next?" It seems to us that it would, and we are unable to distinguish the statute in hand and the one supposed.

If, however, we accept the collocation of Judge Leavitt, we can come to no other conclusion. When affirmatively and concisely stated, we understand it to be this: "This Act shall commence and take effect from its passage, except (provided) that no petition or other proceeding under this Act shall be filed, received, or commenced before the first day of June, 1867." Substitute this language for that which was used, and the result to which we come is the same as that already indicated. In view of the nature of the statute—its remedial character—under the foregoing language, for the reasons already adduced, no part of the Act could have had any operation or effect except that which relates to the establishment of Courts, officers, rules and regulations which were

required as a part of the system, until the first of June. To declare a contrary conclusion, is to blow hot and cold—to assert a proposition intrinsically contradictory—to say that a statute may be in force and not in force at the same time.

But, not conceding the collocation of Judge Leavitt, we ask: Why did not Congress, if they intended the Act should take effect from its passage, in *all respects* except those mentioned in the proviso, say so in direct terms, instead of specifying certain respects less than all? It seems to us that Congress would have done so, had such been their intention, and the fact that they specified particular respects, and not all, is evidence that all were not intended, upon the maxim that "the expression of one excludes the other."

Our conclusion is, that the Act of Congress, so far as it operated to supersede the statute of this State, did not take effect until the first day of June, 1867; and that the defendant's proceedings in insolvency under the State law, having been commenced prior to that date, as we have already shown, were unaffected by its operation.

A further point has been made by counsel for the defendant, to meet the exigencies of his case, in the event we should come to the conclusion that the Act of Congress took effect so as to supersede the statute of this State on the 2d of March, 1867. It is founded upon the doctrine already stated, that the law of Congress does not suspend the State law, unless they are in conflict with each other, and it is argued that there is no conflict between the two statutes, and hence the statute of the State has not been suspended at all. It is unnecessary to decide this point for the purposes of the present case, but as it is understood that some of the Courts of this State hold that the statute of this State is still in operation, and are still entertaining jurisdiction in cases under it, we feel justified in departing from our general rule not to consider questions not necessarily involved in the decision of a case. The interests of both debtors and creditors demand a decision of that question at the first opportunity offered to this Court.

No extended discussion of the question, however, need be indulged in. It is obvious that two statutes having the same general object, and acting upon the same persons and cases by different modes and in different jurisdictions, must be in conflict with each other; and a very cursory glance at the two statutes now before us suffices to show that such is the case in the present instance.

The only substantial difference between a strictly Bankrupt Law and an Insolvent Law lies in the circumstance that the former affords relief upon the application of the creditor, and the latter upon the application of the debtor. In the general character of the remedy there is no difference, however much the modes by which the remedy may be administered may vary. But even in the respect named there is no difference in this instance. The Act of Congress is both a Bankrupt Act and an Insolvent Act by definition, for it affords relief upon the application of either the debtor or the creditor, under the heads of voluntary and involuntary bankruptcy. (Sections 11 and 39.) By comparing the provisions of the Act under the head of voluntary bankruptcy with the provisions of the statute of this State in relation to insolvents, it will be found that the scope and object of each are substantially the same. They both act upon the same persons and upon the same cases, so far as the State law acts at all. Such being the case, it follows that the statute of this State became suspended on the first day of June, 1867, at which time the Act of Congress went into operation; and all proceedings commenced under the State law subsequent to that date are null and void. (*Ex parte Eames*, 2 Story, 326.)

Order reversed, and the Court below directed to enter an order quashing the execution and perpetually staying all further proceedings upon the judgment.