Barney, J.,
delivered the opinion of the court:
The claimants were copartners and subjects of Great Britain, doing business at Hongkong, China, and as such copartners, in the month of August, 1898, shipped certain merchandise from Hongkong to Manila, in, the Philippine Islands, and upon the arrival of said shipments at Manila Avere required to pay to the United States military authorities at that place the duties upon said merchandise prescribed by the Spanish tariff, the same having been continued in force by order of the officer in command of our military forces at that place theretofore promulgated. The port of Manila came into possession of our military forces on the 13th day of August, 1898, and the order last mentioned was issued on the 19th folloAving.
On the 13th day of July, 1898, the following military order Avas issued at Washington by the Secretary of War:
“ WaR DEPARTMENT,
“ Washington, July IS, 1898.
“ The following order of the President is published for the information and guidance of all concerned:
“ ‘ Executive Mansion, July IB, 1898.
“ ‘ By virtue of the authority vested in me as Commander in Chief of the Army and Navy of the United States of America, I do hereby order and direct that, upon the occupation and possession of any ports and places in the Philippine Islands by the forces of the United States the following tariff of duties and taxes, to be levied and collected as a military contribution, and regulations for the administration thereof, shall take effect and be in force in the ports and places so occupied.
“ ‘ Questions arising under said tariff and regulations shall be decided by the general in command of the United States forces in those islands.
*223 “‘ Necessary and authorized expenses for the administration of said tariff and regulations shall be paid from the collections thereunder.
“ ‘Accurate accounts of collections and expenditures shall be kept and rendered to the Secretary of War.
“ ‘ William McKiNley.’
“ Upon the occupation of any ports or places in the Philippine Islands by the forces of the United States the foregoing-order will be proclaimed and enforced.
“ E. A.. AlgeR,

“Secretary of War.”

It is conceded by both parties that this order and the schedule of rates therein referred to did not reach Manila until some time after the 1st of September following, and after the arrival of the claimants’ merchandise at that port and the payment of the Spanish duty thereon as stated. It appears, however, that news had reached that place that some order of' the kind had been issued by the President, but its exact contents or the schedule mentioned were unknown. The claimants appear to have contended that their merchandise, being an American product, ivas not liable to the payment of any duty whatever, and protested against the payment of any duty on that ground, and made no other protest.
This action is brought to recover from the defendant the difference between the amount of the Spanish tariff so paid and the amount if levied according to the order of the President, the same in our exchange being $4,330.72.
The claimants in their petition ask judgment for $32,-945.33, the whole amount of duty paid upon the claim, for the reason already stated that no duty whatever could be exacted; but that contention seems to have been'abandoned.
It will thus be seen that the difference in the tax as collected and paid was paid under the mutual mistake of the parties; that is to say, both parties at the time of payment supposed the Spanish tariff to be in force, and had no knowledge of the schedule as provided by the order of July 12, 1898. This being the case, the question of protest would seem to be eliminated from our consideration, as the Supreme Court appears to have decided that under such circumstances no protest is necessary (Lapeyre v. United States, 17 Wal *224 lace, 191; Norton v. United States, 97 U. S., 164). But as this case is decided upon another point, that question is not considered and is not herein decided. We shall assume, however, in the decision of this case, either that such protest was made or was unnecessary.
The question, then, for us to determine is, When did the order of the President of July 12, 1898, go into effect at Manila — on the day of its date or when it was received and put in force at that place? The answer to this question is somewhat embarrassing, for the reason that no authorities directly bearing upon the subject have been cited to this court by the counsel on either side, and we do not know that any such can be found; certainly in the limited time given for its consideration here no such authority has been found.
Acts of Parliament take effect from the time that they receive the royal assent, and by relation from the earliest moment of the day on which it is given (Tomlinson v. Bullock, 42 B. Div., 230) ; and this rule has been applied in this country, unless otherwise provided in the act itself or bjr some other law. (Arnold v. United States, 9 Cranch, 104; Matthews v. Zane, 7 Wheat., 164; Wellman’s case, 20 Vt., 653.)
It is contended by the claimant that the same rule should apply to military orders of the President, and the case of Lapeyre v. United States (17 Wall., 191) is cited as sustaining that contention. It was there decided that a proclamation of the President declaring certain ports, theretofore closed to foreign commerce by the proclamation of a former President made pursuant to act of Congress, to be open to foreign commerce took effect when it was signed by the President and sealed with the seal of the United States officially attested. It ma}^ be well, hoAvever, to note here that that case was an appeal from this court, but that both courts were divided upon this question. Owing to the illness of one of the judges this court was equally divided. The history of the case in that respect is told in the reporters’ statement of the case in this court:
“ This case has singularly divided two courts. In the court below a reargument was ordered on the principal question whether a proclamation of the Executive takes *225 effect from the day of its date or the time of its promulgation; and the court then stood equally divided, one judge being prevented by illness from taking part in the decision. For the purposes of an appeal, judgment was entered dismissing the petition, and an appeal was taken. In the Supreme Court a reargument was also ordered on the same point, and the court then stood five for reversal and four for affirmance, with one of the majority merely concurring in the conclusion that the judgment should be reversed.” (Le Peyre v. United States, 8 C. Cls. R., 165, 166.)
The case at bar is distinguishable from that case in at least two important respects: (1) That was the proclamation of the President by virtue of an act of Congress; (2) This was a military order of the President, as Commander in Chief of the Army and Navy of the United States, to be enforced in a foreign country under our' military control.
That every citizen is presumed to know the laws of his own country, or the country in which he transacts business, and is bound at his peril to obey them, is elementary; and it follows as a corollary to this rule that he is presumed to have knowledge of all such laws from the day they take effect. When we take into consideration the fact that the greatest judges and best lawyers are ignorant of a large percentage of the laws, this rule seems to be a harsh one, and it often does work great injustice. It is a law of necessity, however, and a little thought shows that no other rule would be safe. The antithesis of this rule is also equally well established, that ignorance of a law of a foreign country is merely ignorance of a fact which no one can conclusively be presumed to know; and, when necessary, foreign laws are put in issue in pleadings and proven the same as any other fact.
In the leading case of Cross v. Harrison (16 How., 180) one of the questions involved was the right of the plaintiffs to recover customs duties paid by them at the port of San Francisco during the time from the date of the treaty of Hidalgo and the time when official notice of the treaty was received in California, a period of about two months. During the Mexican war San Francisco was seized and taken pos *226 session of by our military forces, and customs duties were levied and collected by them in the exercise of belligerent rights; and the rate of duty thus prescribed was collected until notice of the treaty of peace and the cession to us of California was received, whereupon this war tariff was abandoned and duties were afterwards levied in conformity with the tariff laws applicable to other ports of the United States.
That action was brought to recover all of the duties paid by the plaintiffs between February 3, 1848, the date of the treaty of peace, and November 13, 1849, the date the collector at San Francisco entered on the duties of his office; but in the decision of the case the court distinguishes' the duties paid after the treaty of peace and the cession to us of California, but before notice of this fact had reached the military authorities there, and the duties paid after such notice. It appears, inferentially at least, that the rate of duties collected under the war tariff was different from the rate under our general tariff laws then in force. (Id., 189.)
The court, in considering- the duties paid during that period, decided that they were properly collected at the rate and in pursuance of the war tariff until notice of the ratification of the treaty of Hidalgo had been received in California.
In Burke v. Miltenberger (19 Wall., 519) one of the questions involved was whether a military order issued May 17, 1865, by General Banks, then commanding the Headquarters of the Gulf, operated as an injunction upon the proceedings of the marshal who had made a sale pursuant to a judgment rendered in a provisional court then existing in the State of Louisiana during the civil war, it' appearing that said order was never brought to the notice of either of the courts of Louisiana engaged in the decision of the case.
The court decided this order, under the circumstances, 'to have no force in the courts, and said: “ It may be that the courts of the country would take judicial notice that Louisiana at the time mentioned was in the military occupation of our forces under General Banks, but we know of no rule of law or practice requiring this of any other court to take notice of the various orders issued by a military commander *227 in the exercise of the authority conferred upon him.” (Id., 526.)
It is unquestioned that upon the occupation by our military forces of the port of Manila it was their duty to respect and assist in enforcing the municipal laws then in force there until the same might be changed by order of the military commander, called for by the necessities of - war. (Hall’s International Law, 4th ed., sec. 155; Taylor’s International Law, secs. 576, 578.)
The commander of'our forces had the right to take possession of the machinery for the collection of the revenues within the occupied district, and to make such collections. (Hall’s International Law, sec. 158; Taylor’s International Law, sec. 531.) It was therefore well within the authority of General Merritt to make the order he did, continuing the Spanish tariff in force at that port until the same might be changed by higher military authority.
While our occupation of Manila became permanent by subsequent treaty, our possession at the time of the collection of these duties was temporary only, and in point of law was no different from the usual military occupation of belligerent territory. It was foreign territory in our temporary possession, and during such possession we were exercising there the restricted rights of a belligerent. If the President, as Commander in Chief of the Army and Navy, had issued an order here in Washington which had affected the personal conduct of Spanish subjects in Manila, we do not think it could be reasonably contended that those subjects would be presumed to have knowledge of the contents of such order before it had been received and promulgated there. In other words, such an order would not be in force at Manila till it had been received and made known there. If this position is right, it would seem to follow that our military forces there would act in the enforcement of belligerent rights, under the orders of the officer in immediate command until such time as actual notice of different orders had been received from some superior officer.
For all practical purposes it was foreign territory, and oxir military forces there were governing under the rules of in *228 ternational law, and in a sense legislating under such rules until receiving notice of different legislation by a superior power. It was a government de facto, military in character, and subject only to higher military authority actually put in force.
Taking this view of the case, we do not believe that any order of the President providing a tariff schedule for the Philippine Islands would have the effect of modifying any existing tariff regulations there until actually received and promulgated.
Hence, it is the judgment of the court that the petition be dismissed.