UNITED STATES of America

v.

Ronald L. CASSON, Appellant.

Nos. 22376, 22840.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 23, 1969.

Decided March 24, 1970.

ment for robbery [3] by amending the prior laws on both crimes.[4] Between 10 P.M. and 11 P.M. on the same day, appellant Casson in company with another person burglarized a home, stole certain property therein and committed other offenses. The statute did not make any provision with respect to its enactment date but did provide:

> Sec. 1101. Whoever, prior to the date of enactment of this Act, commits any act or engages in any conduct which constitutes an offense under provision of law amended by this Act, shall be sentenced in accordance with the law in effect on the date he commits such acts or engages in such conduct. 81 Stat. 743, D.C.Code § 22–1801 (1969).

In the absence of any provision fixing an exact time for the law to take effect, it would take effect at the same time as all congressional enactment of criminal laws. The United States Attorney interpreted the statute as having taken effect prior to Casson's crimes, and he was accordingly indicted, convicted and sentenced under the new burglary and robbery statutes, as amended.[5] Casson now challenges his convictions on the burglary and robbery counts on the ground that he was denied his constitutional rights by what he contends *in effect* is an *ex post facto* application of the new statutes. We dismiss his contention and affirm.

Mr. Jacob Goldberg, Washington, D. C., with whom Mr. Norman A. Flaningam, Washington, D. C. (both appointed by this court) was on the brief, for appellant.

Mr. Philip L. Kellogg, Asst. U. S. Atty., for appellee. Messrs. David G. Bress, U. S. Atty. at the time the record was filed, Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., also entered appearances for appellee.

Before TAMM, MacKINNON and ROBB, Circuit Judges.

MacKINNON, Circuit Judge:

At 3:05 P.M. on December 27, 1967, the President affixed his signature to an act for the District of Columbia [1] which, *inter alia*, defined the crime of burglary in the first degree, increased the minimum and maximum punishment therefor,[2] and increased the minimum punish-

I

Allowing for the difference in time zones between "The Ranch" and the District of Columbia, it is noted that the crimes were committed about six hours after the President signed the bill. Casson was subsequently indicted on four

---

1. The endorsement on the enrolled bill preserved in the National Archives is as follows:
 Lyndon B. Johnson
 3:05 P.M.
 December 27, 1967
 The Ranch
 Official records are matters of judicial knowledge. IX J. Wigmore, Evidence §§ 2568a, 2572 (3d ed. 1940).

2. D.C.Code § 22–1801(a) (1967), Burglary in the first degree, 81 Stat. 736.

3. D.C.Code, § 22–2901 (1967), Robbery, 81 Stat. 737.

4. Housebreaking (31 Stat. 1323–1324); Robbery (31 Stat. 1322).

5. And for two other offenses.

counts: I (First Degree Burglary), with entering a dwelling while persons were present therein, with intent to steal property of another; II (Robbery), by force and violence and against resistance and by putting in fear stealing and taking from the person and from the immediate actual possession of a designated person, property of other persons of a value of about $392.50; III and IV, assaulting two persons with a dangerous weapon, that is a shotgun.

■ The jury returned guilty verdicts on all counts and defendant was given concurrent sentences as follows: five to fifteen years on Counts I and II, and three to ten years on Counts III and IV. Under the 1967 amendments, for the offense charged in Count I (the burglary count), the penalty of imprisonment was changed by Congress from two to fifteen years to five to thirty years; and under Count II (the robbery count), the minimum punishment was increased from six months to two years imprisonment while the maximum punishment stayed at fifteen years. Thus the actual concurrent sentences adjudged on both counts I and II (5 to 15 years) could have been given under the prior law but appellant contends that the constitutional guarantee against *ex post facto* laws[6] were, in effect, violated because he was *exposed* to larger punishments.[7] *See* Lindsey v. Washington, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937). It is well settled that an *ex post facto* law, under the constitutional guarantee here relied upon, is one "which makes more burdensome the punishment for a crime, *after its commission,* * * *." (Emphasis supplied) Beazell v. Ohio, 269 U.S. 167, 169, 46 S.Ct. 68, 70 L.Ed. 216 (1925). But the statute

here in question on its face is not *ex post facto* since it does not expose appellant to any increased punishment for any act after its commission.

With concurrent sentences having been adjudged on Counts I and II, we recognize the possible application of Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), but because of Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), we elect to deal directly with appellant's *ex post facto* contention.[8]

On this appeal appellant makes two principal contentions. First, he asserts that the actual signing of the bill did not take place at 3:05 P.M. as endorsed on the bill and as stated in the Statutes at Large, but instead took place at 11 P.M. as reported in some newspapers. Secondly, in the event that the bill was signed at 3:05 P.M., he alleges, in the alternative, that it was not announced publicly until around 11 P.M. and that the time of the announcement was the determinative time for fixing the application of the bill to his conduct. He thus contends that to expose him to the larger penalties contained in the amended act would, in effect, make the criminal statute applicable to him on an *ex post facto* basis contrary to the provisions of U.S. Const. art. I, § 9, cl. 3.[9]

## II

■■ We first consider when the bill was actually signed. The original signed document embodying the actual bill which is preserved in the National Archives contains a written notation that it was signed by the President at "3:05 P.M.

---

6. "No * * * ex post facto Law shall be passed." U.S.Const. art. I, § 9, cl. 3.

7. He makes no attack upon the sentences adjudged on Counts III and IV.

8. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) points out that concurrent sentences for different crimes do not remove the elements necessary to create a justiciable case or controversy, and that conviction on any

separate felony, even though punished by a concurrent sentence, might entail prejudicial collateral consequences such as are provided by habitual criminal statutes and be used to impeach his character at some future trial.

9. The trial court stated it would give the same punishment under either statute; but this is not material on the *ex post facto* contention.

December 27, 1967 [at] The Ranch." [10] While no provision of the Constitution or statute requires the President to affix the time or date of signing, the notation constitutes a contemporaneous memorandum and is the best evidence of the fact that the nature of the case permits. Based upon the notation on the bill the official publication of the United States Statutes at Large, 90th Congress, 1st Session (1967), which states in its forepart that it is "Published by authority of law under the direction of the Administrator of General Services by the Office of the Federal Register, National Archives and Record Service," states that the act in question was "approved December 27, 1967, 3:05 P.M." (81 Stat. 744). Congress has declared that the United States Statutes at Large shall be "legal evidence of laws." [11] We accordingly decide that the bill was approved at the time endorsed on the official document and stated in the official publication rather than at the time alleged in appellant's hearsay affidavits. Hearsay newspaper statements are not a sufficient basis for overcoming the best evidence of which the case is susceptible and the presumption of regularity.[12]

### III

We next consider when the bill became law. On this point, the United States Constitution in art. I, § 7, provides, *inter alia:*

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it * * *.

The inescapable conclusion from this language is that those who drafted the Constitution intended a bill to "become a law" when the President indicates his approval by signing it. The applicable United States statute buttresses this conclusion by providing, *inter alia:*

> Whenever a bill * * * of the Senate and House of Representatives, having been approved by the President * * * it shall forthwith be received by the Administrator of General Services from the President * * *. 1 U.S.C. § 106a. Act of October 31, 1951 ch. 655, § 2(b), 65 Stat. 710.

The statute thus recognizes the legislative process as being complete when the bill is "approved by the President" because it then passes "from the President" to the Administrator of General Services who is directed to "carefully preserve the originals" [13] and to publish "the United States Statutes at Large which shall contain all the laws and concurrent resolutions enacted during each regular session of Congress. * * * " [14] Because of these constitutional and statutory provisions we determine that the framers thereof intended that an act such as is here involved would become a law when the President signed the bill. However, questions have arisen as to the precise time during a day that a legislative act would become effective.

Prior to 1793, where no specific effective time was designated, acts of Par-

---

10. See note 1, *supra.*

11. 1 U.S.C. § 112, 65 Stat. 710.

12. Appellant's motion alleges that the Washington Post and Evening Star of December 28, 1967 state that "the bill was *signed* at 11:00 p. m. on said December 27, 1967," (emphasis added) but the newspapers do not so state. The Post states: "The President who is at the LBJ Ranch in Texas, *announced* through his press office in San Antonio *at 11 p.m. that he had signed the bill.*" (Emphasis added). The Star states: "The *announcement that he had signed it came at*

11 *p. m.*" (Emphasis added). Neither newspaper makes any assertion as to when the bill was *signed*. Both refer merely to the time the *news release* was given to the newspapers from the President's press office in San Antonio, some miles distant from The Ranch. Thus, there is no evidence that contradicts that the bill was signed at 3:05 P.M. This is fatal to appellant's contention in this respect.

13. 1 U.S.C. § 106a.

14. 1 U.S.C. § 112.

liament commenced from the first day of the Parliament in which the act was passed. Thus all laws were to some extent retroactive. To correct this "great and manifest injustice," Parliament in 1793 enacted the statute, 33 Geo. III, ch. 13, providing that clerks of Parliament should endorse on every act the date, month and year it receives the royal assent and that the endorsement should be taken to be "a part of such act and to be the date of its commencement when no other is provided." *See* Lapeyre v. United States, 17 Wall. (84 U.S.) 191, 197, 21 L.Ed. 606 (1873). Congress has never enacted a similar statute requiring the time and date of the President's approval of a bill to be endorsed thereon.

In the United States it was early decided in an opinion by Chief Justice Marshall that a civil statute for the commencement of which no time is fixed commences from its date. Matthews v. Zane, 7 Wheat. (20 U.S.) 164, 211, 5 L.Ed. 425 (1822). Gardner v. Collector, 6 Wall. (73 U.S.) 499, 504, 18 L.Ed. 890 (1867) remarked, "The date of the President's approval of the bill is undoubtedly the date at which it became law," and Lapeyre v. United States, *supra*, held that a presidential proclamation (terminating civil war hostilities) took effect when he signed it, and stated the same rule applied to laws. As applied to our present situation, those decisions would make this act effective at 12:01 A.M. on the day it was signed by the President, notwithstanding that his signature was not af-

fixed until mid-afternoon. Fractions of a day were not recognized. *See* In re Welman, 29 F.Cas. 681 (No. 17,407) (D.C.Vt.1844); In re Howes, 12 F.Cas. 715 (No. 6,788) (D.C.Vt.1843). However, Burgess v. Salmon, 97 U.S. 381 (1878), refused to apply a taxing act with criminal penalties which was approved by the President in the afternoon to a commercial transaction completed in the morning. Because of the criminal penalties the court stated that enforcing a retroactive application of the law to a time prior to its actual approval would make it an *ex post facto* law. We consider Burgess v. Salmon, *supra*, to be controlling law on this point and follow it by deciding that the bill became a law at 3:05 P.M. when it was signed by the President, and not before.[15]

### IV

Having decided the time the bill became law we next consider whether the *ex post facto* provision of the Constitution imposes any impediment to applying its penalties for burglary and robbery to Casson. The not too veiled inference in appellant's argument is that he is being prosecuted for disobedience of a law which the Government kept him "from the knowledge of."[16] Let us see what knowledge of the laws in question was available to Casson in 1967.

On December 27, 1967, there was no constitutional or statutory provision expressly requiring that acts passed by Congress had to be published before they

15. In following Burgess v. Salmon, 97 U.S. 381, 24 L.Ed. 1104 (1878), we do not overlook the very early case of *Cotton Planter*, 6 Fed.Cas. 620 (No. 3,270) (1810). In that case an embargo was held not to be applicable to a *domestic* ship until notice of the law was received but this conclusion was heavily influenced by the fact that the embargo did not apply to *foreign* ships until they received notice thereof. This express provision requiring actual notice for foreign ships is one fact that distinguishes it from this case and another one is that the conduct there prohibited (foreign trade) was lawful until the passage of the embargo act.

Lapeyre v. United States, 17 Wall. (84 U.S.) 191, 199, 21 L.Ed. 606 (1873) states: Congressional "Acts take effect before they are printed or published. * * * They had [have] a valid existence on the day of their date and permit no inquiry upon the subject * * *" as to any other effective date. Gardner v. Collector, 6 Wall. (73 U.S.) 499, 504, 18 L.Ed. 890 (1867) held that congressional acts become effective on the date they are signed by the President.

16. 48 Harv.L.Rev. 198, 213 (1934) was cited.

became effective.[17] The act establishing the Federal Register made no provision for publishing congressional acts or resolutions, (44 U.S.C. § 303, and see 82 Stat. 1274) but the Public Printer was required to print copies of all public laws in slip form (44 U.S.C. § 191 (1964), 66 Stat. 541) and in permanent form after the close of each congressional session.[18]

Appellant's claim that he was denied access to knowledge of the law, however, overlooks the widespread publication that Congress gives to the contents of a bill as it journeys through the legislative process. We take judicial notice of the applicable statutes, rules and established usages of Congress under which both the House and Senate promptly publish all bills and proceedings and make the same openly available at all times to the public merely on inquiry or request. The District of Columbia Omnibus Crime Bill which contained the amendments to the burglary and robbery statutes here involved is a good example of the widespread publication of bills in Congress.[19] The bill, H.R. 10783 of the 90th Congress, was preceded by extensive public hearings beginning on March 20, 1967 by the House Committee on the District of Columbia. Many Government and public witnesses appeared and testified and the proceedings were officially recorded and reported and were promptly made available to the general public. Following the hearings, the Committee met and agreed on a bill, reported it favorably and caused it to be introduced in the House of Representatives on June 13, 1967. Upon introduction several thousand copies of the bill were printed and distributed as required by statute.[20] Also, in accordance with the House Rules, the Committee report was printed [21] to include the text of the existing statute and a comparative print to show the proposed amendments.[22] The bill was con-

17. Congress at one time provided for prompt publication of new laws as they were enacted in newspapers of the several states (3 Stat. 439, 576) but these provisions were repealed and the Secretary of State was directed to deliver copies to the congressional printer for printing as soon as possible after enactment. (15 Stat. 40, Rev.Stat.1878 §§ 3803, 3805). There was never any suggestion that the effectiveness of the bill was in any way dependent upon such publication.

Regarding the earlier practice of publishing laws in England, Justice Miller in Gardner v. Collector, 6 Wall. (73 U.S.) 499, 18 L.Ed. 890 (1867), quoted Lord Coke as follows:

[A]lthough proclamation be not made in the county, every one is bound to take notice of that which is done in Parliament, for as soon as Parliament hath concluded anything, the law intends that every person hath notice thereof, for the Parliament represents the body of the whole realm, and therefore it is not requisite that any proclamation be made, seeing the statute took effect before.

18. Public Law 90-620, October 22, 1968 (82 Stat. 1249) revised and codified the prevailing practices with respect to publishing and distributing congressional proceedings. 44 U.S.C. §§ 701-910, and see particularly §§ 709, 710 with respect to slip opinions.

19. The legislative history hereafter described is from the Congressional Record, Vol. 113.

20. 44 U.S.C. §§ 131, 189 (1967).

21. Rules of the House of Representatives of the United States, by Lewis Deschler, Parliamentarian, 90th Congress, p. 374, § 745, Rule XIII, cl. 2. "All reports of committees * * * shall be delivered to the clerk for printing * * * " p. 420, § 821, Rule XIX, cl. 2 " * * * and all bills * * * reported from a committee shall be accompanied by reports in writing which shall be printed." See also § 983, paragraphs 2 and 3, for printing of bills and reports.

22. *Id.* Rule XIII, cl. 3:

Whenever a committee reports a bill or a joint resolution repairing or amending any statute or part thereof it shall include in its report or in an accompanying document—

(1) The text of the statute or part thereof which is proposed to be repealed; and

(2) A comparative print of that part of the bill or joint resolution making the amendment and of the statute or part thereof proposed to be amended,

sidered in public session in the House of Representatives on June 26, 1967 and was passed the same day by that body by a vote of 355 to 14. The debates were fully reported by the official reporters in conformance with statute and were printed in the Congressional Record which is issued daily.[23] In addition to being available in bill form and in the committee report, the bill was printed *in extenso* in the Congressional Record for the day (pages 17183 to 17186) together with the section by section analysis from the Committee Report (pages 17207 to 17210). The daily circulation of the Congressional Record is upwards of 48,-000 copies.

In the Senate, additional public hearings were held on the bill by a subcommittee of the Judiciary Committee and thereafter it was reported with amendments on December 8, 1967. By unanimous consent the Senate ordered the Committee Report with the minority views to be printed (Cong.Rec. p. 35562). Also, the Senate amendment, which included the entire bill as it subsequently passed the Senate, was printed in the Congressional Record (pp. 35744–35747). This printing involved distribution to the usual recipients of the usual number of copies.[24] The usual number was 1682 copies but the rules also provided for printing and distribution of extra copies.[25] The bill was debated by the Senate on December 11 and 12 and on December 12th passed that body without any floor amendment by a 67 to 9 vote. So the bill (1) as printed in bill form by the Senate, (2) as printed at length in the Senate Committee Report, and (3) as printed in the Senate proceedings for December 12, 1967 at pages 35744 to 35747 of the Congressional Record was the exact form of the bill as it passed the Senate. On December 13, 1967, the House agreed to the Senate amendment and again the complete text of the bill was printed in the Congressional Record (pp. 36405–36408). This made the fourth printing of the bill *in form exactly as it passed the Senate*. The bill was then placed in enrolled form and sent to the President for his consideration.

During the passage of the bill through Congress the news media gave wide publicity to its provisions. In addition, Casson, or any interested person by merely inquiring could easily determine the exact status of the bill and obtain an exact copy in its then form at each stage of its legislative history from its introduction on June 13 until the time of its final passage on December 13. Also, the Congressional Record gave prior notice of all scheduled hearings.

Had inquiry been made during the 90th Congress concerning the District of Columbia Omnibus Crime Bill, H.R. 10783, or had investigation been made of congressional material available to the public, one would have learned that no change was made in the proposed penalty for first degree burglary from the day the bill was introduced until it was passed. Thus as far back as June 13, 1967, information was available to the

---

showing by stricken-through type and italics, parallel columns, or other appropriate typographical devices the omissions and insertions proposed to be made: *Provided, however*, That if a committee reports such a bill or joint resolution with amendments or an amendment in the nature of a substitute for the entire bill, such report shall include a comparative print showing any changes in existing law proposed by the amendments or substitute instead of as in the bill as introduced.

This is known as the Ramseyer Rule.

23. 113 Cong.Rec., June 26, 1967, pp. 17183 to 17215 (1967).

24. *See* Rules and Manual of United States Senate, p. 351, referring to 44 U.S.C. § 131 as it existed prior to amendment by P.L. 90–620, Oct. 22, 1968, 82 Stat. 1246, 44 U.S.C. § 701.

25. Rules and Manual of United States Senate, p. 353, 44 U.S.C. §§ 132, 133, 137 (1967); 1000 reprint copies of pending bills and committee reports could also be printed at the discretion of the Secretary of the Senate or the Clerk of the House of Representatives. 44 U.S.C. § 137 (1967).

general public that Congress was proposing to fix the penalty for first degree burglary at a minimum of 5 and a maximum of 30 years. With respect to the penalty for robbery, the bill as originally introduced provided for a 4 year minimum period of imprisonment and this provision was not changed by the House. However, when the Senate Committee reported the bill the proposed minimum penalty for robbery was reduced from 4 to 2 years and thereafter no change took place in this provision. Thus the general public had information available to them from December 8, 1967 that the Congress was proposing to fix the minimum period of imprisonment for robbery at the 2 years that was provided by the final bill.

 No changes were made in either of these provisions after December 8th. Up until December 13, there was the *possibility* of a change but *on and after December 13, 1967 the exact terms of the final bill were precisely known and from that day on no change was possible in the penalties*. The bill would either become law with those penal provisions or the bill would be vetoed in its entirety by the President. From December 13, 1967 on any person interested in the bill had only to be concerned with one thing, *i. e.*, to be informed of the *time* the President signed the bill—if he signed it. There is no showing here that this information could not have been obtained promptly on request. That staff members of congressional committees accommodate the public, on request, by informing them of the status of bills in various stages of the legislative process is a matter of common knowledge of which we take judicial notice.[26] There is also the possibility, as frequently occurs, that the action the President proposes to take on a bill might be learned in advance by an appropriate inquiry. In the instant case, over six hours transpired from the time the President signed the bill until the offense was committed by Casson. During this period of time there is no showing in this record that it was impossible for an interested person to learn that the President had signed the bill at 3:05 P.M. The fact that the news story on the bill was not released until several hours later in San Antonio does not determine how quickly an inquiry by an interested citizen might have evoked the information. With instantaneous communications as they exist today, it would only take a few minutes for such information to be ascertained. December 27, 1967 was a Wednesday, a regular working day, so it was a working night. Assuming *arguendo* that legislation must pass a notice test to escape an *ex post facto* condemnation, we decide that the public are charged with knowledge of all the published information concerning a congressional bill that is available during the entire legislative process. Here, the Congressional Record and documents published by Congress prove that the bill and all its provisions were in the public domain for over six months, received the widest publicity and full disclosure by Congress and over 100,000 copies of the bill in the exact form in which it passed were printed, distributed and available to the general public over two weeks before the President signed the bill. This is more than adequate notice to the public of the contents of the bill. Actual notice to a particular individual is not a prerequisite. We accordingly decide that Casson was chargeable with knowledge of the contents of the bill and its signature at the time of his offenses, that he is bound by the provisions of the law and that the law did not, *in effect*, operate on an *ex post facto* basis as to him. His convictions on first degree burglary and robbery are accordingly

Affirmed.

ROBB, Circuit Judge (concurring):

I concur in the result and agree that the bill amending the burglary statute became law at 3:05 P.M., December 27,

---

26. Atchison Etc. Ry. Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932); IX J. Wigmore, Evidence § 2565 (3d ed. 1940).

1967, when the President signed it. I do not agree to the implication in Part IV of the opinion, that the appellant was not bound by the amended statute unless knowledge of the contents of the bill and of its enactment was in fact available to him. In my opinion this is not the law; certainly it is not so in the case of a statute dealing with a crime *malum in se,* such as burglary. I think the statutory enactment was, in law, notice of its terms to all affected, including the appellant. See 3 M. Merrill on Notice, § 1104 (1952).